

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-2001

# Ameristeel Corp v. Local Union 430

Precedential or Non-Precedential:

Docket 00-3366

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Ameristeel Corp v. Local Union 430" (2001). *2001 Decisions.* Paper 220.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/220

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 26, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3366

AMERISTEEL CORPORATION

v.

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, AFL-CIO,
ARBITRATION ASSOCIATION

International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers
of America, AFL-CIO, Teamsters Local 430,
        Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 99-cv-02131)
District Judge: Honorable William W. Caldwell

Argued November 30, 2000

Before: BECKER, Chief Judge, RENDELL,
and MAGILL,* Circuit Judges

(Opinion Filed September 26, 2001)

_____

* Honorable Frank J. Magill, Senior Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

Ira H. Weinstock, Esq. [ARGUED]
Joseph P. Milcoff, Esq.
Ira H. Weinstock, P.C.
800 North Second Street, Suite 100
Harrisburg, PA 17102
 Counsel for Appellant

John G. Creech, Esq. [ARGUED]
D. Rangle Moody, II, Esq.
Haynsworth, Baldwin, Johnson &
 Greaves
918 South Pleasantburg Drive
Greenville, SC 29607
    -and-
Mark J. Manta, Esq.
Klett, Rooney, Lieber & Schorling
810 Bear Tavern Road
Mountain View Office Park,
 Suite 302
West Trenton, NJ 08628
 Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

I. Introduction

This appeal presents the question whether a successor employer who has expressly refused to be bound by its predecessor's collective bargaining agreement may nonetheless be forced to arbitrate grievances pertaining to the agreement. Because an unconsenting successor cannot be bound by the substantive provisions of its predecessor's agreement, we hold that the successor in this case, appellee AmeriSteel Corporation, cannot be forced to arbitrate the extent of its obligations under the agreement. AmeriSteel, quite simply, has no obligations under the agreement-- and thus no arbitration award for the appellant, Teamsters

Local 430, could possibly receive judicial sanction. In such circumstances, the arbitration forum designated in the collective bargaining agreement is an inappropriate vehicle by which to settle the parties' dispute. Therefore, we will affirm the District Court's order which enjoins the Union and the American Arbitration Association from including AmeriSteel as a party in pending arbitration proceedings, or any other arbitration proceedings involving the collective bargaining agreement.

Our resolution of this case avoids creating the incongruous situation in which a successor employer may be forced to arbitrate the extent of its obligations under its predecessor's agreement, and yet the arbitrator is powerless to enforce these obligations because they are not binding on the successor employer. While we recognize the vital importance of arbitration as a means of settling labor disputes, we think it clear that arbitration should not proceed when ultimately it can serve no purpose. Furthermore, our decision recognizes the sound principle that arbitration cannot be used as a means to accomplish illegitimate ends. More specifically, given that AmeriSteel has no obligations under the collective bargaining agreement, any arbitration award to the appellant Union would necessarily reach beyond the agreement itself and into the realm of the arbitrator's own notion of industrial justice, a practice expressly forbidden by the United States Supreme Court.

II. Facts and Procedural Background

Appellee AmeriSteel is a Florida corporation engaged in the manufacture and sale of steel products. On April 29, 1999, AmeriSteel purchased various assets of Brocker Rebar, including a manufacturing facility in York, Pennsylvania, and AmeriSteel commenced operations at the York facility on May 3, 1999. Appellant Teamsters Local 430 ("Local 430" or "Union") represents certain employees at the facility, namely truck drivers, warehousemen, material handlers, and other helpers. A collective bargaining agreement ("CBA") existed between Local 430 and Brocker Rebar, effective from December 1, 1996 to November 30, 1999. The purchase agreement between

AmeriSteel and Brocker Rebar included various provisions expressly stating that AmeriSteel was not to be bound by the terms of the CBA. In its dealings with the Union, AmeriSteel has consistently and repeatedly maintained that it is not bound by the terms of the CBA, and therefore that it is not bound to arbitrate under the agreement.

AmeriSteel hired roughly 50 employees to work in the York facility, and all but six members of Local 430 who had worked for Brocker Rebar were hired by AmeriSteel. In addition, AmeriSteel retained four Brocker Rebar executives. Because it had hired a majority of the Local 430 members who had worked for Brocker Rebar, AmeriSteel was obligated to bargain with the Union. Bargaining with the Union broke down, however, on May 10, 1999, when AmeriSteel withdrew recognition of the Union based on a petition purportedly signed by a majority of the Union employees, in which they supposedly stated that they no longer wanted to be represented by Local 430. The Union then initiated an unfair labor practices action against AmeriSteel before the NLRB, but that action is not before us on appeal.

Local 430 filed a grievance on behalf of all its members against Brocker Rebar and AmeriSteel on April 22, 1999, challenging unilateral changes that would occur in working conditions at the York facility when the AmeriSteel purchase agreement was consummated. Closing under the purchase agreement occurred on April 29, 1999. In May 1999, after the parties were unable to resolve the grievance, the Union requested arbitration pursuant to the arbitration clause in the CBA. AmeriSteel filed a Complaint and motion for injunctive relief in the United States District Court for the Middle District of Pennsylvania on December 9, 1999, seeking to enjoin Local 430 and the American Arbitration Association from proceeding to arbitration with AmeriSteel as a party. On March 17, 2000, the District Court granted AmeriSteel a preliminary injunction, reasoning that AmeriSteel could not be bound to arbitrate under the pre-existing CBA because AmeriSteel was not the "alter ego" of Brocker Rebar, nor had AmeriSteel agreed to abide by the CBA. App. at 256-57.

4

Local 430 complains on appeal that the District Court should not have granted the preliminary injunction in the first place, and that the court compounded its error by, in effect, granting a permanent injunction without analyzing the applicable standard for granting a permanent injunction. Unfortunately, the District Court might have caused some unnecessary confusion by not explicitly stating that it was, in fact, granting a permanent injunction, and not merely a preliminary one. We have in the past admonished district courts to avoid this type of oversight. E.g., CIBA-GEIGY Corp. v. Bolar Pharm. Co., 747 F.2d 844, 847 (3d Cir. 1985) (observing that although the Third Circuit could convert the district court's opinion into a permanent injunction, "we would much prefer that the district court recast its own opinion in the language of the standard it is applying. This would eliminate the possibility of confusion as to what the district court intended and would, in the long run, promote judicial economy").

Nonetheless, it is apparent that the District Court implicitly granted a permanent injunction, and we find no reversible error in the court's procedure. In its opinion, the District Court announced a legal standard under which Local 430 could prevail only if it could prove that AmeriSteel was the "alter ego" of Brocker Rebar, or that AmeriSteel had agreed to abide by the CBA. It is undisputed that AmeriSteel is not the "alter ego"[1] of Brocker Rebar and that AmeriSteel has expressly rejected the CBA. Thus, there were no triable issues of fact and no need for a trial on the merits. In other words, AmeriSteel

_____

1. Under the "alter ego" doctrine, a successor employer "is subject to all the legal and contractual obligations of the predecessor" when the successor is a mere "alter ego" of the predecessor, or nothing more than "a disguised continuance of the old employer." NLRB v. Omnitest Inspection Servs., 937 F.2d 112, 118 (3d Cir. 1991). An "alter ego" relationship exists "when there is a mere technical change in the structure or identity of the old employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management." Id. As the District Court observed, AmeriSteel's purchase of Brocker Rebar was a transaction involving two unrelated parties, and there "has been no suggestion that AmeriSteel is a sham or alter ego of Brocker Rebar." App. at 255.

5

had already prevailed on the merits, and therefore the District Court's order, in effect, grants AmeriSteel a permanent injunction. Any further proceedings in the District Court would have served no purpose. Consequently, we are squarely presented with the question of whether AmeriSteel can be bound to arbitrate under the CBA.

## III. Jurisdiction and Standard of Review

The District Court had jurisdiction over this action pursuant to 28 U.S.C. S 1331 and 29 U.S.C.S 185. Because the District Court's order, in effect, grants a permanent injunction, we have appellate jurisdiction pursuant to 28 U.S.C. S 1291, which provides for appeals of all final decisions of the federal district courts.

We review a district court's decision to grant or deny a permanent injunction under an abuse of discretion standard. E.g., ACLU v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471, 1476 (3d Cir. 1996). However, because an abuse of discretion exists where the district court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact," id., we apply plenary review to the District Court's legal conclusions.

## IV. Discussion

This case requires us to navigate the treacherous waters of the Supreme Court's labor law successorship doctrine, which has, at times, imposed extra-contractual duties upon successor employers. Appellant Local 430 argues that AmeriSteel, as a successor employer to Brocker Rebar, must arbitrate grievances brought by the Union under the collective bargaining agreement between the Union and Brocker Rebar. AmeriSteel counters that it was never a party to the CBA, expressly rejected it during its asset purchase negotiations with Brocker Rebar, and has consistently maintained in its dealings with the Union that it is not bound by the terms of the CBA, including its arbitration clause. Accordingly, AmeriSteel argues that it cannot be compelled to submit to arbitration.

6

As an initial matter, we note that labeling AmeriSteel a "successor employer" to Brocker Rebar does little to help resolve the issue in this case. As the Supreme Court has explained, a new employer, like AmeriSteel, "may be a successor for some purposes and not for others," and the question whether AmeriSteel is a successor to Brocker Rebar "is simply not meaningful in the abstract." Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249, 262 n.9 (1974). Accordingly, the question we must ask is: what are the legal obligations of AmeriSteel to the employees of Brocker Rebar? Id. Or more specifically: does AmeriSteel have a duty to arbitrate with the Union under the CBA? As the District Court correctly noted, the resolution of that latter question depends, in large part, on the proper interpretation of three decisions of the U.S. Supreme Court: John Wiley & Sons v. Livingston , 376 U.S. 543 (1964), NLRB v. Burns International Security Services, Inc., 406 U.S. 272 (1972), and Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249 (1974).

While other courts have tried to make sense of these three opinions, we find no analysis that charts a perfect course that we can readily follow. Accordingly, we will make our own way through the progression of the Supreme Court's reasoning. As the dissent points out, it is unfortunate that the law in this area is unsettled, and ultimately, only the Supreme Court can silence the conflict that exists in the troubled trilogy of Wiley, Burns, and Howard Johnson. Given the tension that exists in this trilogy, no approach to reconciling these cases will be completely satisfying. Nevertheless, we think it significant that, as discussed below, our ultimate result (and the logic that underpins it) is supported by the majority of courts that have articulated the contours of labor law successorship.

In Wiley, the Court introduced the idea that a successor employer could be bound by an arbitration clause in a collective bargaining agreement between the predecessor employer and its unionized employees. The predecessor employer, Interscience, had merged with John Wiley & Sons, and ceased to do business as a separate entity. The Union then brought suit against Wiley to compel arbitration

7

under the collective bargaining agreement. Wiley , 376 U.S. at 544-45. The Court posed the legal issue as follows: "whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision." Id. at 547. The Court answered this question in the affirmative. Id. at 550-51.

The Court acknowledged that "the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party," but distinguished the case at hand by explaining that"a collective bargaining agreement is not an ordinary contract." Id. at 550. The Court grounded this extra-contractual duty in federal law -- specifically,"the policy of our national labor laws," id. at 548, which recognized both the "central role of arbitration" and the importance of "protect[ing] . . . employees from a sudden change in the employment relationship," id. at 549. Thus, the Court explained, "the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed." Id. at 550.

The Court's holding is actually quite limited:

> We hold that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement.

376 U.S. at 548.

The Court then went on to note that "[w]e do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives." Id. at 551. Rather, factors such as lack of "substantial continuity of identity in the business enterprise" before and after the change could alter the result; so could the parties' conduct, if, for instance, the union fails to continue to make its claims known. Id. Without continuity, the duty to arbitrate would be

8

"something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." Id. Thus, the"substantial continuity" concept -- first alluded to by the Court after it announced its holding -- should properly be viewed as a necessary but not a sufficient condition for the imposition of arbitration on an unconsenting successor.

The Court also observed that "[o]f course, the Union may not use arbitration to acquire new rights against Wiley" that were not grounded in the collective bargaining agreement itself. Id. at 555. Whether the Union's demands had merit was for the arbitrator to decide in light of the facts, yet arbitration would be inappropriate if "it can be seen in advance that no award to the Union could receive judicial sanction." Id. Such was not the case in Wiley -- because the Union's demands were not "plainly unreasonable" -- and therefore the Court permitted the demands to proceed to arbitration. Id.

Although the Wiley holding, strictly speaking, addresses only the duty to arbitrate, we have in the past noted that a necessary implication of Wiley's holding is that Wiley, the successor employer, could possibly be bound by the substantive terms of the CBA. E.g., Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956, 960 (3d Cir. 1974). This conclusion "is manifest from the fact that the very question upon which the successor must, under Wiley, submit to arbitration, is the extent to which the other terms of the predecessor's contract are binding on the successor." Id. at 960 n.20. If Wiley could not possibly be bound by the substantive terms of the CBA, arbitration would be a wholly pointless exercise. Moreover, if the terms could not possibly be enforced against Wiley, then no arbitration award to the Union "could receive judicial sanction," and thus the Wiley Court would not have permitted the case to proceed to arbitration in the first place. Wiley, 376 U.S. at 555.

In Burns, the Supreme Court took a very different approach to the issue of whether a successor employer could be bound by the substantive terms of its predecessor's CBA. The predecessor employer, the Wackenhut Corporation, had provided plant protection services at a Lockheed Aircraft Service plant for several

9

years before the successor, Burns International Security Services, took over this task after outbidding Wackenhut for the security contract. Burns, 406 U.S. at 274-75. A majority of the employees hired by Burns had been employed by Wackenhut, but Burns refused to honor the existing CBA between Wackenhut and these employees. The Union then filed an unfair labor practice charge with the NLRB, and the Board ordered Burns to comply with the CBA executed by Wackenhut. Id. at 275-77.

In reversing the NLRB, the Supreme Court endorsed the Board's earlier, consistently-held interpretation that successor employers could not be bound against their will by the substantive terms of existing CBAs. Id. at 285-91. Specifically, the Burns Court noted that:

> These considerations, evident from the explicit language and legislative history of the labor laws, underlay the Board's prior decisions, which until now have consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.

Id. at 284 (emphasis added).

In reaching its decision, the Burns Court stated that the federal labor policy of preventing industrial strife did not outweigh "the bargaining freedom of employers and unions." Id. at 287. Therefore Burns, which had "in no way agreed" to the existing CBA, could not be compelled to accept contract provisions against its will. Id. at 282, 287. Moreover, the Court reasoned, forcing either a union or a successor employer to be bound by the substantive terms of an old CBA "may result in serious inequities." Id. at 287. For example, saddling successor employers with the terms and conditions contained in old CBAs "may discourage and inhibit the transfer of capital" because many potential employers will be willing to rescue moribund businesses only if they can negotiate their own CBAs. Id. at 287-88. Additionally, a union may have made concessions to a small or economically-troubled predecessor employer that it

10

would not be willing to make to a large or economically powerful successor. Id. at 288. In sum, the balance of bargaining advantage between employers and labor should "be set by economic power realities," and the federal labor policy of avoiding industrial strife would be ill-served by binding either employers or employees to contract terms that "do not correspond to the relative economic strength of the parties." Id.

Wiley and Burns, therefore, appear to be in direct conflict. On the one hand, the holding in Wiley necessarily implies that unconsenting successor employers may be bound by the substantive terms of pre-existing CBAs. But on the other hand, Burns endorses the idea that unwilling successors cannot be bound by such terms. As the principal means of distinguishing these two cases, the Burns Court offered the somewhat unsatisfying distinction that Wiley arose in the context of a suit to compel arbitration, whereas Burns involved an unfair labor practice proceeding in front of the NLRB.2Id. at 285-86. Not

_____

2. The Burns Court also suggested that Wiley and Burns could be distinguished on the basis that Wiley involved a merger, which triggered the general state law rule "that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation."
Burns, 406 U.S. at 286. In Wiley, the Court had noted that the union's argument -- which may well have influenced its specific holding -- was based on principles of corporate consolidation. Wiley, 376 U.S. at 547-48 ("The Union relies on S 90 of the N.Y. Stock Corporation Law, . . . which provides, among other things, that no `claim or demand for any cause' against a constituent corporation shall be extinguished by a consolidation."). In Howard Johnson, the Court again noted this distinction with approval, Howard Johnson, 417 U.S. at 257, yet the Court has since downplayed this distinction as determinative of a successor's labor law obligations, e.g., Fall River Dyeing & Finishing Corp.
v. NLRB, 482 U.S. 27, 44 n.10 (1987) (noting that "the way in which a successor obtains the predecessor's assets is generally not determinative" of the successor's labor law obligations); see also Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182 n.5 (1973) (observing that "[t]he perimeters of the labor-law doctrine of successorship" are not confined by the boundaries of state corporation law, and that "[t]he refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets" is due to the fact that as long as there is "continuity in the employing industry, the

11

surprisingly, in the aftermath of Burns, courts struggled to reconcile Burns with Wiley, and could do little more than repeat the Supreme Court's emphasis on the procedural distinction between the two cases. E.g., Bill's Trucking, 493 F.2d at 961 (noting that "it was specifically emphasized in Burns that Wiley arose in the context of a . . . suit to compel arbitration, not in the context of an unfair labor practice proceeding," and that "Burns, then, cannot be read to foreclose absolutely the imposition upon a successor employer of the contract obligations entered into by its predecessor").

It is against this backdrop that, just two years after Burns, the Supreme Court took up the issue of labor law successorship in Howard Johnson. The Court began by acknowledging the conflicting reasoning of Wiley  and Burns, but rejected the idea that the cases could be distinguished on the basis of their procedural context, because distinguishing the cases in this manner would inappropriately "permit the rights enjoyed by the new employer in a successorship context to depend upon the forum in which the union presses its claims." Howard Johnson, 417 U.S. at 256. With this distinction repudiated, the Howard Johnson Court appeared to be squarely faced with an irreconcilable conflict between Wiley  and Burns: either the substantive terms of an existing CBA could be imposed against an unconsenting successor, as is implicit in Wiley, or they could not, as stated by Burns.

The Howard Johnson Court, however, chose not to deal with this conflict, and instead walked a very narrow path. Rather than deciding "whether there is any irreconcilable conflict between Wiley and Burns," the Court decided the case on the ground that "even on its own terms, Wiley does not support the decision of the courts below," which had compelled the successor employer, Howard Johnson, to

_____

public policies underlying the doctrine will be served by its broad application"). We have ourselves implicitly indicated that no special significance should be attached to the fact that Wiley involved a merger. E.g., Bill's Trucking, 493 F.2d at 957-61 (applying Wiley in the context of
a sale of capital stock).

submit to arbitration pursuant to a CBA between its unionized employees and the predecessor employer, the Grissoms. Id. at 256. In other words, even on its own terms, Wiley did not compel the conclusion that Howard Johnson must proceed to arbitration against its will, and likewise could not justify imposing the substantive terms of the CBA against Howard Johnson.

The Howard Johnson Court contrasted the facts of its case with Wiley, noting that the most important distinction is that in Wiley, "the surviving corporation hired all the employees of the disappearing corporation," whereas in Howard Johnson the successor "hired only nine of the 53 former Grissom employees and none of the Grissom supervisors." Id. at 258, 260. The Court emphasized that, because Howard Johnson had hired so few of the Grissom employees, there was no "substantial continuity in the identity of the work force across the change in ownership," which placed the case outside the realm of Wiley . Id. at 262-63. Wiley had stated that the lack of "substantial continuity" would remove the situation from the ambit of its holding, and the lack of substantial continuity thus dictated the result.

It is important, for the purposes of this appeal, to appreciate the limited scope of the Court's decision in Howard Johnson. As explained above, the Court did not reconcile the conflict between Wiley and Burns. The Howard Johnson Court simply pointed out that, consistent with Wiley, and on Wiley's own terms, the lack of substantial continuity meant that the Court needed to look no further. Accordingly, Howard Johnson does not bridge the gap between Wiley and Burns, nor does it establish broadly applicable guiding principles that should be implemented when analyzing labor law successorship problems.[3]

_____

3. Our main point of disagreement with our dissenting colleague is in our view that Howard Johnson's focus on substantial continuity does not make it the sole basis for finding a continuing duty to arbitrate or making agreements binding, but, rather, as one sine qua non. There is a difference: while the existence of substantial continuity is a necessary ingredient, its presence does not necessarily render the new entity

Still, Howard Johnson does give some indication as to the Court's thinking on the conflict between Wiley and Burns. Throughout the opinion, the Court downplays the significance of Wiley, describing its holding as a "guarded, almost tentative statement," id. at 256, and focusing on the limited factual context in which Wiley arose, id. at 256-64. In contrast, the Court takes an expansive view of Burns, repeatedly extolling its reasoning. Stating at the outset that "[c]learly the reasoning of Burns must be taken into account here," id. at 256, the Howard Johnson Court goes on to observe that "[w]hat the Union seeks here is completely at odds with the basic principles this Court elaborated in Burns," id. at 261, and that the reasoning in Burns "established that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired," id. at 262. In short, the best reading of Howard Johnson is that it does not resolve the conflict between Wiley and Burns, but it does much to strengthen and reaffirm the reasoning of Burns, and certainly does nothing to call into question Burns' assertion that successor employers "are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." Burns, 406 U.S. at 284.

Nevertheless, one might argue (at least in theory) that Burns has somehow been modified by Howard Johnson, based on the reasoning that Howard Johnson's emphasis on "substantial continuity in the identity of the work force"

_____

bound. (If one is not 35 years of age, one cannot be President of the United States; this is a sine qua non. However, if one is 35 years of age, he or she does not necessarily qualify. Being a native-born citizen is another sine qua non, in fact.) The difficulty, having explored the three "guiding" cases, is that we must determine what are all the sine qua nons. We cannot subscribe to the dissent's view that these cases equate substantial continuity with successorship or "mandates" such a finding here. Clearly, as Wiley itself indicates, other factors must also be considered. See Wiley, 376 U.S. at 551. Burns says that contractual understandings are important, but the dissent discredits that concept. While we concede that the scope of the directive of Burns may not be crystal-clear, we suggest that the directives of Wiley and Howard Johnson are clearly narrower than the dissent's view would allow.

necessarily implies that if such "substantial continuity" does exist, then arbitration under the existing CBA would be appropriate. And if such arbitration were to go forward, it follows that the substantive terms of the CBA could be enforced, and thus Burns cannot survive intact.4

In our view, however, this reading of Howard Johnson would stretch its carefully circumscribed holding beyond recognition. As explained above, the holding in Howard Johnson does nothing more than simply point out that on the facts of the case, not even Wiley (and certainly not Burns) could justify forcing Howard Johnson to submit to arbitration against its will. In other words, because the Court was able to base its result on the lack of"substantial continuity," it simply did not reach the issue of whether, had there been "substantial continuity," the successor employer would have been forced to arbitrate and necessarily could have been bound by the substantive terms of the CBA. Indeed, nothing in the Howard Johnson opinion calls into question either the reasoning or the holding of Burns -- as explained above, there is much in the opinion that reaffirms Burns -- and thus we cannot accept any interpretation of Howard Johnson that either explicitly or implicitly modifies Burns' conclusion that a successor employer cannot be bound against its will by the substantive provisions of its predecessor's CBA. Here, the parties specifically agreed that the CBA would not be binding, and Burns teaches that we must respect that agreement.

Our reading of Burns and Howard Johnson is confirmed by the Supreme Court's observations in Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27 (1987). In reviewing the principles of labor law successorship, the Court reiterated Burns' assertion that "the successor . . . is not bound by the substantive provisions of the predecessor's

_____

4. While the dissent does not frame its argument in precisely these terms, nonetheless this reasoning is implicit in the dissent's conclusion that "there is sufficient `substantial continuity of identity in the business
enterprise,' between Brocker Rebar and AmeriSteel to justify holding that AmeriSteel is bound to the arbitration provision (and possibly to the substantive provisions) of Brocker Rebar's CBA with Local 430." Dissenting Op. at 37.

15

collective-bargaining agreement."5 Fall River, 482 U.S. at 40 (citing Burns, 406 U.S. at 284). Significantly, in the very next sentence, the Court cited Howard Johnson , so it cannot be argued that the Fall River Court somehow overlooked Howard Johnson when reaffirming Burns. Rather, the only conclusion that can be drawn is that after Howard Johnson, Burns rests on solid ground.

This conclusion, however, serves to illuminate the perplexing issue presented by this appeal -- namely, that while the validity of Burns cannot be doubted, Burns nonetheless conflicts with the implications of Wiley. The most we can say with assurance regarding this conflict is that while the contours of Wiley are narrow, and its status not entirely clear, Burns' language and logic have been reinforced in later cases. Accordingly, we believe the clear mandate of Burns -- that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor -- provides more persuasive guidance than the limited holding in Wiley. That being the case, AmeriSteel cannot be bound by the substantive terms of the CBA at issue here, which was negotiated between Brocker Rebar and the Union and which AmeriSteel's purchase agreement specifically stated would not be binding on it. And because AmeriSteel cannot be bound by the substantive terms of the CBA, no arbitration award to the Union -- which, of course, would be based on the substantive terms of the CBA -- could receive judicial sanction, and therefore AmeriSteel cannot be compelled to submit to arbitration.6  Wiley, 376 U.S. at 555.

_____

5. The dissent attempts to downplay the significance of this statement by characterizing it as a "cryptic piece of dicta." Dissenting Op. at 36 n.2. While it is arguably dicta, there certainly is nothing "cryptic" about it. This is a simple, straightforward statement that makes a general observation about successors, taken almost word-for-word from Burns. The dissent would re-write the statement as referring to only "Burns-type successors," but we see no reason to believe that the Fall River Court meant anything other than what it said.

6. In reaching this conclusion, we are not, as the dissent appears to indicate, overstepping our authority as a lower federal court by "emasculat[ing] Wiley." Dissenting Op. at 28. Rather, when faced with a

16

While there is no directly controlling authority in our Circuit, nonetheless we think the result that we reach here flows logically from our existing Circuit precedent. For example, in Stardyne, Inc. v. NLRB, 41 F.3d 141 (3d Cir. 1994), we observed that a successor has an obligation to recognize and bargain with the union that represented its predecessor's employees, but that a successor is "not bound by its predecessor's collective bargaining agreement." Id. at 145 n.3. Similarly, in Pick—Mt. Laurel Corp. v. NLRB, 625 F.2d 476 (3d Cir. 1980), we noted that when analyzing labor law successorship, the Supreme Court has held "that a successor does not stand in the same shoes as its predecessor because it will not be bound to the previously bargained for terms, [and] the Court construed the relevant policies to prevent imposing on the successor an obligation to be bound by past events and arrangements." Id. at 484. And, as explained above, if AmeriSteel cannot be bound by these "past events and arrangements" in the form of Brocker Rebar's CBA, then it necessarily follows that arbitration under the CBA is inappropriate because no award for the Union "could receive judicial sanction."7 Wiley, 376 U.S. at 555.

_____

body of Supreme Court precedent that is, as the dissent points out, "discordant in [ ] overall tone and approach," id. at 24, we are simply choosing what we believe to be the best interpretation. And in so doing, we are performing our appropriate role as a federal appellate tribunal in the most basic sense. (The dissenting opinion arguably emasculates Burns in similar fashion when it urges that the sales agent expressly repudiating the CBA is "irrelevant to the analysis." Dissenting Op. at 32.)

Moreover, we do not agree that our result in this case necessarily emasculates Wiley, or relegates it "to the dustbin of history," Dissenting Op. at 30, although we do decline to give Wiley  as broad a reading as does Chief Judge Becker. We suggest that one who reads Wiley on its own, start to finish, would be struck by its careful and restrictive analysis, which leads to its equally narrow holding, which we quoted above, that collective bargaining agreement provisions do not automatically go by the wayside when a corporate consolidation occurs. Wiley, 376 U.S. at 548.

7. Several other cases in our Circuit have addressed the labor law successorship doctrine, but we find these decisions of limited utility. For

17

Moreover, we find it significant that our resolution of this case is supported by the decisions of our sister circuit courts of appeals. Indeed, in the time since Fall River, every one of our sister circuits that has addressed the issue has concluded that an unconsenting successor employer cannot be bound by the substantive terms of an existing CBA.8

_____

example, in Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956 (3d Cir. 1974), we addressed Wiley and Burns , but we distinguished the two cases based on their procedural distinction. Id.  at 961. As explained above, the Court has since rejected this means of distinguishing the cases. Supra p. 13. In American Bell Inc. v. Federation of Telephone Workers, 736 F.2d 879 (3d Cir. 1984), we touched upon the successorship doctrine, but ultimately did not reach the issue because we concluded that the doctrine did not apply. Id. at 888. And in Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66 (3d Cir. 1988), we construed Burns somewhat narrowly, but we think it unwise to place any particular emphasis on this case. As a case primarily concerned with the imposition of Rule 11 sanctions, Cement Express did not give labor law successorship a thorough treatment, as evidenced by the fact that in our discussion, we did not mention Howard Johnson or Fall River. Id. at 69. Moreover, in distinguishing Wiley and Burns, we relied on the procedural distinction between the two cases that the Court has repudiated. Id.

In concluding that AmeriSteel had no duty to arbitrate, the District Court appeared principally to rely upon our decision in NLRB v. Phoenix Pipe & Tube, 955 F.2d 852 (3d Cir. 1991), which the District Court characterized as standing for the proposition that"by retaining the workforce of a prior employer, a subsequent employer becomes obligated to bargain with a union, but not to abide by the collective bargaining agreement." App. at 257. This is a puzzling statement, however, because Phoenix Pipe does not support this proposition, and the District Court included no supporting citation to the case. Given that Phoenix Pipe says nothing regarding a successor's obligations under its predecessor's CBA, we conclude that the case is not relevant to the issues presented by this appeal. Accordingly, while we agree with the District Court's ultimate conclusion that AmeriSteel cannot be compelled to arbitrate, we disagree with the reasoning that the District Court employed to arrive at that result.

8. The dissent states that the case law from other courts of appeals "cuts in both directions," Dissenting Op. at 38, but, we cannot agree. It references only two appellate cases that supposedly cut in its favor, id. at 38 n.4, but neither case is particularly relevant. Boeing Co. v.

18

E.g., Local 7–517 v. Uno–Ven Co., 170 F.3d 779, 781 (7th Cir. 1999) (stating that when a successor purchases a predecessor's business, the successor "would not be bound by the collective bargaining contract"); NLRB v. Hosp. San Rafael, Inc., 42 F.3d 45, 50 (1st Cir. 1994) (observing that "[w]here, for example, a unionized business is acquired by a new owner unaffiliated with the old one, the new employer may not be bound by a collective bargaining agreement with the old one"); Southward v. S. Cent. Ready Mix Supply Corp., 7 F.3d 487, 495 (6th Cir. 1993) (asserting that the Supreme Court has "repeatedly recognized that a successor corporation may be bound by the substantive terms of its predecessor's CBA only if the successor is the alter ego of the predecessor or the successor has expressly or impliedly assumed the obligations of its predecessor's contract"); Sullivan Indus. v. NLRB, 957 F.2d 890, 895 (D.C. Cir. 1992) (noting that "[w]hile a successor has a duty to bargain with an incumbent union, it is not bound by the substantive terms of the previously negotiated collective–bargaining agreement"); New England Mech., Inc. v. Local Union 294, 909 F.2d 1339, 1342 (9th Cir. 1990) (explaining that a successor employer "is not bound by its predecessor's collective bargaining agreement," and that "the Supreme Court has continually indicated that a successor employer is only bound to bargain with a union which had a CBA with the predecessor"). District courts in our Circuit have come to the same conclusion. E.g.,

_____

International Association of Machinists and Aerospace Workers, 504 F.2d 307 (5th Cir. 1974), predates Fall River, and therefore is of limited utility.

And in Stotter Division of Graduate Plastics Co. v. District 65, 991 F.2d 997 (2d Cir. 1993), the court based its determination that Stotter was a successor employer not only on continuity, but also on the fact that the obligations at issue arose before the transfer, and the fact that Stotter had "entered into an agreement with the Union which adopted (with immaterial exceptions) the provisions of the [CBA]." Id. at 1002. Thus, Stotter is not persuasive on this issue. The dissent can cite no post–Fall River case in our sister circuits that has bound an unconsenting successor employer to the substantive provisions of an existing CBA. We submit there are none. Indeed, were the dissent's interpretation to prevail, it would place us squarely at odds with every court of appeals to consider this issue, as noted above.

19

Philadelphia Joint Bd. v. After Six, Inc., No. 92-4294, 1992 WL 202166, at *2 (E.D. Pa. Aug. 6, 1992) (maintaining that "if an employer takes over another business, the employer is not bound by its predecessor's collective bargaining agreements. At most, the employer will be required to bargain with any unions that the predecessor employer had recognized."); Local Union No. 4 v. Owens-Illinois, Inc., 758 F.Supp. 962, 973 (D.N.J. 1991) (observing that "[u]nder Wiley and Burns, although [the successor] had an obligation to recognize and bargain with the Union .. . [the successor] could not be required to assume [the predecessor's] labor contract"). Additionally, many commentators are in accord. E.g., Burton F. Boltuch, Workplace Closures and Company Reorganizations: Enforcing NLRB, Contract and Noncontract Claims and Obligations, 7 Lab. Law. 53, 78 (1991) (explaining that "[c]ourts and arbitrators since Burns do not hold the `unconsenting' successor to the CBA"); Claiborne Barksdale, Successor Liability Under the National Labor Relations Act and Title VII, 54 Tex. L. Rev. 707, 711 (1976) (arguing that a "successor will not be bound . . . by the substantive terms of the predecessor's contract with the employees unless it either explicitly or impliedly ratifies the agreement"); Wilson McLeod, Rekindling Labor Law Successorship in an Era of Decline, 11 Hofstra Lab. L.J. 271, 308-09 (1974) (explaining that "courts are firmly opposed" to enforcing the substantive terms of a predecessor's CBA against a successor, and that if the Burns holding rests on solid footing, then "there is no principled reason why successors should be forced to arbitrate at all").

Given the prevailing case law supporting our view, and given the teachings of Wiley and Burns that expose the futility and inappropriateness of arbitration when the substantive terms of the bargaining agreement cannot be binding on the new entity, we are curious as to what purpose is to be served by arbitration? How can we hold, as the dissent would, that such a pointless exercise is mandated, especially given the fact that the specific contractual provisions between the parties did in fact not merely "shed" the prior agreement containing the

20

arbitration provisions, but specifically contracted them away?

Finally, we think it is important to note that our decision in this case does not overlook the vital importance of arbitration as a means of settling labor disputes. We have in the past observed that federal labor law elevates labor arbitrators "to an exalted status," Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1126 (3d Cir. 1969), and that "courts play an extremely limited role in resolving labor disputes," News Am. Publ'n, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990). Moreover, an arbitration award must be enforced "[a]s long as the arbitrator has arguably construed or applied the contract," News Am., 918 F.2d at 24 (emphasis in original), which is in accord with the Supreme Court's instruction that an arbitration award is legitimate as long as it "draws its essence from the collective bargaining agreement," United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987).

What distinguishes this case, however, is that because AmeriSteel cannot be bound by the substantive terms of the CBA between Brocker Rebar and the Union, there simply is no contract for the arbitrator to construe. While we must respect the vital role that arbitration plays in settling labor disputes (and the correspondingly broad authority granted to arbitrators), we think it goes without saying that courts should not compel parties to submit to arbitration when there is nothing to arbitrate. To hold otherwise would create the paradoxical situation in which AmeriSteel would be forced to arbitrate the extent of its obligations under the CBA, and yet, because it has no such obligations, the arbitrator would be powerless to enforce these obligations.

One might argue that even though AmeriSteel has no obligations under the CBA, this case should still proceed to arbitration on the theory that an arbitrator could conceivably grant an award to the Union based on some general sense of equity or fairness. Even granting this possibility, such an award would be illegitimate because it would "simply reflect the arbitrator's own notions of industrial justice" and would not "draw its essence from the

21

contract" itself. Misco, 484 U.S. at 38. As Chief Judge Becker has highlighted, an arbitrator's authority is quite broad, but it is not unlimited, because courts cannot "permit[ ] the arbitrator to transform the contractual arbitration into an equitable dispensation of his own brand of industrial justice, an endeavor expressly forbidden by the Supreme Court's decision in United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29 (1987)." News Am. Publ'n, Inc. v. Newark Typographical Union, Local 103, 921 F.2d 40, 41 (3d Cir. 1990) (Becker, J., dissenting from denial of rehearing en banc).

Our decision here recognizes the sound principle that arbitration, while critically important to settling labor disputes, nonetheless cannot be used as a means to achieve illegitimate ends. Were we to permit this case to proceed to arbitration, we would be guilty of "wav[ing] a wand" over the arbitration proceedings by engaging in the fiction that an arbitrator could legitimately grant an award for the Union. Id. at 42. But when arbitration is placed within its proper limits, there is no escaping the conclusion that AmeriSteel, which is not bound by the substantive terms of the CBA, cannot be compelled to submit to arbitration because no arbitration award to the Union could receive judicial sanction.

Accordingly, the March 17, 2000 order of the District Court will be AFFIRMED.

BECKER, Chief Judge, dissenting.

It is surprising that thirty-seven years after John Wiley & Sons v. Livingston, 376 U.S. 543 (1964), in which the Supreme Court first tackled the issue of successorship liability in labor cases, the law in this area is still unsettled. Wiley established that the notion of "substantial continuity in the identity of the business enterprise" is the principal criterion for determining successorship liability, and held that, in appropriate circumstances, successor employers can be required to arbitrate with their employees' union under the terms of the collective bargaining agreement (CBA) that the union had with the predecessor employer. Id. at 548, 551.

In NLRB v. Burns International Security Services, Inc., 406 U.S. 272 (1972), and Howard Johnson Co. v. Hotel and Restaurant Employees, 417 U.S. 249 (1974), the Court considered how the Wiley doctrine applied in different factual contexts. In American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879, 888 (3d Cir. 1984), this Court used Wiley and Howard Johnson as the basis for developing a six-factored test for determining whether substantial continuity in the identity of the business enterprise is present: (i) continuity of work force, (ii) continuity of business operations, (iii) continuity of supervisory personnel, (iv) continuity of physical plant and location, (v) continuity in the nature of the product or services, and (vi) continuity in the methods of production, sales, or inventorying.

As counsel for AmeriSteel had to concede at oral argument, the record in this case is crystal clear that in the transition of ownership of the York plant from Brocker Rebar to AmeriSteel, there has been not only substantial continuity but utterly no change in any of the American Bell factors except possibly for the methods of sales, which AmeriSteel's counsel represented had changed (although he was unclear as to how and to what degree). In other words, after closure for a three-day weekend, a new business appeared at 1700 Seventh Avenue in York that was the exact same enterprise as the one that had been there four days before in virtually all respects. Despite these uncontroverted facts and their close similarity to those in

23

Wiley, the majority holds that the successor corporation, AmeriSteel, is not bound by the arbitration provision of its predecessor's CBA.

Judge Rendell's thoughtful opinion makes clear that resolving this case requires an analysis of Wiley, Burns, and Howard Johnson, the Supreme Court's cases addressing when a successor can be bound to the terms of a predecessor's CBA. Her opinion also demonstrates the difficulty of reconciling those cases and, implicitly at least, underscores the problems with choosing one path of reconciliation over another. I cannot join the majority's opinion because I believe that the case before us is controlled by the Supreme Court's decision in Wiley, which involved a fact pattern that is similar in all relevant aspects to the facts in the case at bar, just as the other key cases involved quite different facts. While I do not suggest that AmeriSteel is duty-bound to accept the CBA that Brocker Rebar signed with Teamsters Local 430 (the union representing Brocker's employees), I do believe that Wiley mandates that we hold that AmeriSteel is bound to arbitrate with the union as to whether it is bound by any of the CBA's provisions.

In other circumstances, the foregoing might well suffice for a dissenting opinion. But Wiley, Burns, and Howard Johnson are difficult to harmonize if not discordant in their overall tone and approach, and I disagree with the majority's attempt to fit these opinions together. I believe that the Supreme Court would do well to revisit this area which remains unclear twenty-seven years after Howard Johnson, the latest of the trilogy. Under these circumstances, I think it useful to explain my disagreement with the majority in some detail.

I.

In Wiley, a publishing firm, Interscience, entered into a CBA with a union that represented its employees. Interscience then merged with another publishing firm, John Wiley & Sons, and ceased to do business as a separate entity. The union and Wiley were unable to agree what effect the merger had on the CBA, so the union

24

brought an action to compel arbitration under the CBA in order to determine the effect. Wiley pointed out that it did not sign the CBA, and argued that it therefore should not be bound by the CBA's arbitration clause. The Court, however, ultimately held that "in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." Wiley, 376 U.S. at 548. As the majority rightly points out, Wiley also states that to send the case to arbitration (as it did), the union's demands under the substantive terms of the CBA must not be "so plainly unreasonable that . . . it can be seen in advance that no award to the Union could receive judicial sanction." Id. at 555. Wiley nonetheless holds that "in appropriate circumstances," a successor employer can be held bound to the arbitration clause of its predecessor's CBA, and possibly can be held bound to the substantive terms of the CBA as well--despite the fact that (like AmeriSteel) the successor never agreed to be so bound and was not the alter ego of the predecessor.

The key question for our purposes is what are these "appropriate circumstances" in which a CBA can be enforced against a successor employer. Wiley is brief in its description of these circumstances, but it does state that there must be "relevant similarity and continuity of operation across the change in ownership" so that there is "substantial continuity of identity in the business enterprise before and after [such] a change." Id. at 551. In Wiley, this continuity of identity and operation of the business enterprise was "adequately evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty." Id.

The Court did not address the notion of "substantial continuity of identity in the business enterprise," in the next case in the trilogy, Burns, because it was clear in that case that there was absolutely no continuity between the predecessor and the successor. See Burns, 406 U.S. at 286 ("Here there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns."). In Howard Johnson, however, the Court elaborated on that concept. In that case, the Grissom family ran a Howard

25

Johnson's restaurant and motor lodge and entered into a CBA with the union representing their employees. The Grissoms thereafter sold to the Howard Johnson Company all of the personal property that they had been using to run the restaurant and lodge. By the terms of the sale agreement, Howard Johnson assumed four specific contracts relating to the operation of the restaurant and lodge but specifically declined to assume the CBA. Howard Johnson then hired its own workforce to staff the restaurant and lodge; it hired forty-five employees, only nine of whom had previously been working for the Grissoms at the restaurant (the Grissoms had had fifty-three employees), but hired none of the Grissoms' supervisory employees. See Howard Johnson, 417 U.S. at 250-52.

The union filed suit, seeking an order to compel Howard Johnson to arbitrate the extent of its obligations to the former Grissom employees under the terms of the CBA. The Court ruled against the union, holding that the substantial continuity between the predecessor and successor corporations that was present in Wiley was missing in the case before it. See id. at 264-65. In particular, the Court noted that in Wiley the successor corporation hired all of the predecessor's employees and did not make substantial changes in its operation of the enterprise, as Interscience's former employees "continued to perform the same work on the same products under the same management at the same work place as before the change in the corporate employer." Id. at 258 (quoting Interscience Encyclopedia, Inc., 55 Lab. Arb. 210, 218 (1970) (the arbitrator's opinion in Wiley)). In contrast, Howard Johnson selected and hired its own independent work force to run the restaurant and lodge.

The case before us involves the same sort of "substantial continuity of identity in the business enterprise" that was present in Wiley but missing in Howard Johnson. The predecessor corporation, Brocker Rebar, negotiated a CBA with Local 430. Brocker Rebar then sold substantially all of its assets to AmeriSteel, including "the Business as a going concern and all of the assets, properties, and rights of the Sellers constituting the Business or used by the Sellers

26

therein, of every type and description, real and personal, tangible and intangible, wherever located." Asset Purchase Agreement between AmeriSteel and Brocker Rebar at 3. The assets purchased included Brocker Rebar's steel plant and equipment located at 1700 Seventh Avenue in York, where Local 430's members worked, along with all of Brocker Rebar's contracts and leases, except the CBA and individual employment contracts.

Instead of selecting and training its own work force (as the successor did in Howard Johnson), AmeriSteel hired all but six of Brocker Rebar's former employees to work at the same plant (50 workers are needed to run the plant), doing the same jobs that they performed before the sale. AmeriSteel also hired Brocker Rebar's top supervisory personnel at the plant (again in contrast to Howard Johnson, where the successor hired none of the predecessor's supervisors). The York plant is situated in exactly the same location where it was before and produces the exact same product using the same inventory, the same equipment, the same physical set-up, and the same production methods that it did when it was Brocker Rebar's plant. In short, insofar as the plant's workers were concerned, virtually nothing changed at the plant when AmeriSteel took over except for the name on the door.

In my view, this almost total continuity in Brocker Rebar's and AmeriSteel's operation of the York plant brings this case under Wiley's rule binding a successor corporation to the arbitration clause in its predecessor's CBA when there is almost total continuity of the business enterprise. As was the case in Wiley, the employees in the case at bar " `continue[ ] to perform the same work on the same products under the same management at the same work place as before the change in the corporate employer.' " Howard Johnson, 417 U.S. at 258 (quoting Interscience Encyclopedia, Inc., 55 Lab. Arb. at 218). Moreover, as the majority recognizes, the Supreme Court has held that the one potentially relevant difference between this case and Wiley--in Wiley the predecessor was merged into the successor, while here there was no merger but a purchase of assets--is irrelevant in the context of successor liability. See Maj. Op. at 11 n.2; see also Fall

27

River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 44 n.10 (1987); Golden State Bottling Co. v. NLRB , 414 U.S. 168, 182 n.5 (1973).

One implication of Wiley is that a successor that is bound by the arbitration clause of its predecessor's CBA may end up being bound by (at least some of) the substantive provisions of the CBA as well. The majority is concerned that a potential problem with such a regime is that corporations may be hesitant to purchase the assets of other corporations if they thought they might be saddled with the other corporations' labor agreements. I share that concern. However, Wiley struck a balance between corporate freedom and the protection of workers, recognizing that arbitration was an important means of maintaining labor peace and that "employees who are in fact retained in `[t]he transition from one corporate organization to another' " need to be afforded protection "from sudden changes in the terms and conditions of their employment." Howard Johnson, 417 U.S. at 264 (quoting and describing Wiley). The implication of the majority opinion is that Wiley is virtually a dead letter confined to its specific facts, essentially overruled. But it is not within our power to emasculate Wiley––only the Supreme Court can do that. See State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) (holding that the Court of Appeals was correct to apply a Supreme Court precedent despite the precedent's "infirmities, [and] its increasingly wobbly, moth–eaten foundations," because "it is this Court's prerogative alone to overrule one of its precedents") (internal quotation marks omitted).[1]

_____

1. The majority attempts to refine its position with the argument that the "substantial continuity" concept in Wiley  "should properly be viewed as a necessary but not a sufficient condition for the imposition of arbitration on an unconsenting successor." Maj. Op. at 9; see also Maj. Op. at 13–14 n.3. It adds, "Clearly, as Wiley  itself indicates, other factors must also be considered." Maj. Op. at 14 n.3. With all respect, I believe that this reading of Wiley conflicts with Howard Johnson's treatment of Wiley. In Howard Johnson, the Supreme Court applied the analytical precepts of Wiley, interpreting Wiley  as making "substantial continuity in the identity of the business enterprise" the centerpiece of the analysis of when a successor can be bound to arbitrate under a predecessor's CBA.

28

II.

Turning to a global analysis of the majority's decision, it is based upon the following two premises: (1) a successor corporation cannot be bound to the substantive terms of a predecessor's CBA unless it agrees to be so bound or is an "alter ego" of the predecessor; and (2) a successor corporation that is not bound by the substantive terms of a CBA should not be bound by an arbitration provision in that CBA either, because any decision by the arbitrator enforcing the CBA could not "receive judicial sanction" and thus arbitration could "serve no purpose." Maj. Op. at 3, 9, 16. Because it is undisputed that AmeriSteel did not agree to be bound by the CBA and there is no evidence that AmeriSteel is the alter ego of Brocker Rebar, the majority concludes that AmeriSteel cannot be bound by the arbitration provision in Brocker Rebar's CBA with Local 430. However, a simple exercise in deductive logic reveals that premises (1) and (2) lead inexorably to the conclusion that an arbitration clause of a CBA can never be enforced against a successor corporation unless the successor

_____

The Court held in Howard Johnson that the successor corporation was not bound to arbitrate under the predecessor's CBA because there was insufficient substantial continuity in the business enterprise, and the clear implication of the opinion is that, if there had been such substantial continuity, then the successor would have been so bound. I see nothing in Howard Johnson that would lead me to the conclusion that the Court would have held that the successor was not bound to arbitrate even if there had been such substantial continuity, because the "other factors" present in Wiley were missing there. See Howard Johnson, 417 U.S. at 264–65 ("Since there was plainly no substantial continuity of identity in the work force hired by Howard Johnson with that of the Grissoms, and no express or implied assumption of the agreement to arbitrate, the courts below erred in compelling the Company to arbitrate the extent of its obligations to the former Grissom emloyees."); see also id. at 258 (" Even more important, in Wiley the surviving corporation hired all of the employees of the disappearing corporation.") (emphasis added); id. at 263 (noting that the Court's holding "is reflected in the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor in S 301 suits under Wiley").

29

agreed to be bound by the CBA or is the predecessor's alter ego. I cannot accept the majority's reasoning because its logical consequence flatly contradicts the holding of Wiley, see supra Part I.

Although the majority denies that it has relegated Wiley to the dustbin of history, it is abundantly clear from its opinion that it is doing just that. In order to get around the fact that Wiley's holding is implicated in the case at bar because of the very close similarity of fact patterns in this case and Wiley, the majority concludes that (1) Wiley is in "direct" and "irreconcilable conflict" with Burns because "Burns endorses the idea that unwilling successors cannot be bound" by "the substantive terms of pre-existing CBAs"; (2) Howard Johnson "downplays the significance of Wiley" while "tak[ing] an expansive view of Burns," thus strongly reaffirming Burns while casting Wiley into doubt; so (3) Burns's dicta rather than Wiley's holding provides the relevant rule for this case because Burns's dicta provides "more persuasive guidance" than Wiley's "limited holding," whose "status [is] not entirely clear." Maj. Op. at 11, 12, 14, 16. I disagree with all three steps in this analysis.

A.

First, the majority's finding of an irreconcilable conflict between Wiley and Burns depends upon its erroneous characterization of Burns as establishing "the clear mandate . . . that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor." Maj. Op. at 16. The majority relies on the following language in Burns:

> These considerations, evident from the explicit language and legislative history of the labor laws, underlay the Board's prior decisions, which until now have consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them.

Burns, 406 U.S. at 284.

30

When this passage is considered in its entirety, it becomes clear that this is not Burns's holding and that to read it as establishing a "clear mandate" is a misinterpretation of Burns. As I read Burns, its holding is much more narrow, constrained by the Court's caution that its "[r]esolution [of the case] turns to a great extent on the precise facts involved here." Id. at 274. Unlike in Wiley, the Court in Burns did not recite an explicit holding; rather, the Court's actual conclusions in Burns are narrowly tailored to the particular facts of that case and carefully avoid any broad, sweeping statements of what the law is in this area. The overarching focus of the Court's reasoning in Burns is to show that Wiley does not control in Burns's fact situation because of the differences in the predecessor-successor relationships and in the legal claims made by the unions. See id. at 285-87, 291 (setting out the Court's own conclusions, which center on distinguishing Wiley). In sum, Burns does not "clear[ly] mandate . . . that an unconsenting employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor." Maj. Op. at 16.

The majority further concludes that if a predecessor and successor explicitly agree that the predecessor's CBA will not be binding on the successor, "Burns teaches that we must respect that agreement." Maj. Op. at 15. I do not understand Burns to support this conclusion, and in fact this reading of Burns conflicts with the majority's own characterization of the law in this area. As the majority itself observes, Wiley recognized that "an unconsenting successor" can owe an "extra-contractual duty," grounded in " `the policy of our national labor laws,' " to arbitrate with a union under the predecessor's CBA. Maj. Op. at 8 (quoting Wiley, 376 U.S. at 548). It is clear that this duty, if implicated, is owed by the successor to the union, since the duty requires the successor to arbitrate with the union and the union can sue the successor to enforce the duty. However, the majority seems to believe that the successor's extra-contractual duty to the union can be abrogated by an express contractual provision in an agreement between the successor and its predecessor, with which the union was in no way involved. See Maj. Op. at 17, 20 ("[T]he specific contractual provisions between [AmeriSteel and Brocker Rebar] did in fact not merely `shed' the prior agreement

31

containing the arbitration provisions, but contracted them away[.]"). I find no support in either Supreme Court precedent or legal reasoning for the position that an extra-contractual duty owed to an entity can be nullified by a contract to which that entity is not a party. Therefore, I believe that the provision in the AmeriSteel-Brocker Rebar sales agreement expressly repudiating the CBA is irrelevant to the analysis.

B.

The majority's treatment of Howard Johnson is similarly flawed because it is based on the view that Howard Johnson "downplays the significance of Wiley," and "takes an expansive view of Burns." Maj. Op. at 14. On this basis, the majority implicitly holds that Burns effectively overruled Wiley. See Maj Op. at 16 ("[W]hile the validity of Burns cannot be doubted, Burns nonetheless conflicts with the implications of Wiley. . . . Accordingly, we believe the clear mandate of Burns -- that an unconsenting successor employer cannot be bound by the substantive terms of a CBA negotiated by its predecessor -- provides more persuasive guidance than the limited holding in Wiley."). I cannot agree with this reasoning.

The majority concedes that the centerpiece of Howard Johnson's analysis involved applying the precepts of Wiley to the facts before the Court. See Maj. Op. at 13. I note that this is hardly consistent with the view that Howard Johnson "downplays the significance of Wiley." Furthermore, if Burns effectively overruled Wiley, then why would Howard Johnson (decided after Burns) use Wiley's analytical structure to reach its decision? If the majority's analysis is correct, then surely the Howard Johnson Court would have simply stated that Burns overruled Wiley and then based its decision on Burns's "holding" that unconsenting successor employers (who are not an alter ego of the predecessor) are never bound by the substantive terms of a predecessor's CBA. The Supreme Court has not been reluctant to overrule its own decisions when satisfied that they were wrong or based on outdated or anachronistic reasoning. See, e.g., State Oil Co. v. Khan, 522 U.S. 3, 20 (1997). Tellingly, however, Howard Johnson did not do this,

32

but instead rested its decision upon Wiley's analytical structure. The clear implication of this, I believe, is that the Howard Johnson Court did not understand Burns to have overruled Wiley. I thus cannot understand how the majority now purports to hold implicitly that Wiley is overruled.

Moreover, Howard Johnson's description of Wiley's holding as a "guarded, almost tentative statement," see Maj. Op. at 14 (quoting Howard Johnson, 417 U.S. at 256) is not made in the context of downplaying the Wiley's significance, but instead is actually a laudatory comment praising Wiley's careful reasoning. This description of Wiley's holding is made in the course of the Court's observation that, in every case in this area (including Burns and Howard Johnson itself), "we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law. . . . [E]mphasis on the facts of each case as it arises is especially appropriate." Howard Johnson, 417 U.S. at 256. Howard Johnson then reaffirms Burns's statement that Burns's decision " `turn[ed] to a great extent on the precise facts involved here' " (hardly an "expansive view" of Burns), and concludes that this sentiment applies equally well to all cases in this area of the law. Id. (quoting Burns, 406 U.S. at 274) Howard Johnson interprets Wiley's "guarded, almost tentative statement of its holding" as demonstrating that the Wiley Court was properly aware of the need for the Court to constrain its holding to the particular facts of the case. Id. In short, Howard Johnson does not bury Wiley, but praises it.

Finally, Howard Johnson specifically notes that its interpretation of Wiley (based on the notion of "substantial continuity of identity in the business enterprise," see supra Part I) preserved for Wiley a substantial role in the protection of union members' rights:

> This interpretation of Wiley is consistent also with the Court's concern with affording protection to those employees who are in fact retained in "[t]he transition from one corporate organization to another" from sudden changes in the terms and conditions of their employment, and with its belief that industrial strife would be avoided if these employees' claims were

33

>       resolved by arbitration rather than by "the relative
>       strength . . . of the contending forces."

Id. at 264 (quoting Wiley, 376 U.S. at 549). I think the above passage clearly communicates the Court's intention in Howard Johnson that Wiley should continue to protect employees from "sudden changes in the terms and conditions of their employment" in situations like the one before us--where there is a change in corporate ownership but the employees and the running of the business remain overwhelmingly the same. Again, this is just not consistent with an interpretation of Howard Johnson as"downplay[ing] the significance of Wiley." Maj. Op. at 14.

III.

I think that a much better reconciliation of the trilogy can be developed from a passage in Howard Johnson  discussing the concept of successorship that the majority quotes early in its opinion but then promptly ignores. See  Maj. Op. at 7. In this passage, Howard Johnson states that the lower court's division of issues into (1) whether Howard Johnson was a successor employer, and (2) whether a successor is required to arbitrate under its predecessor's CBA, was artificial and unhelpful, because "successor" is not a monolithic concept.

>       The question whether Howard Johnson is a "successor"
>       is simply not meaningful in the abstract. Howard
>       Johnson is of course a successor employer in the sense
>       that it succeeded to operation of a restaurant and
>       motor lodge formerly operated by the Grissoms. But
>       the real question in each of these "successorship"
>       cases is, on the particular facts, what are the legal
>       obligations of the new employer to the employees of the
>       former owner or their representative? The answer to
>       this inquiry requires analysis of the interests of the
>       new employer and the employees and of the policies of
>       the labor laws in light of the facts of each case and the
>       particular legal obligation which is at issue, whether it
>       be the duty to recognize and bargain with the union,
>       the duty to remedy unfair labor practices, the duty to
>       arbitrate, etc. There is, and can be, no single definition

34

> of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

Howard Johnson, 417 U.S. at 262 n.9 (emphasis added). In my view, this passage, along with Burns's admonition that its decision "turns to a great extent on the precise facts involved here," 406 U.S. at 274, serves as a clear warning to lower courts not to read these opinions as providing expansive rules about successors in general; instead, the rules of these cases should always be understood in the context of the facts of the particular case. The majority appears to recognize this point when it quotes from the above passage and states that "labeling AmeriSteel a `successor employer' to Brocker Rebar does little to help resolve the issue in this case." Maj. Op. at 7. But the majority then ignores its own direction when it interprets Burns as making a general pronouncement that successors are never bound by the substantive terms of their predecessors' CBAs, thus treating all successorship situations as legally identical.

I think the best reconciliation of the Wiley–Burns–Howard Johnson trilogy is that the cases set out a"sliding scale" for what types of burdens can be imposed on what types of successors. That is, the successorship relationships in these three cases were very different, and the burdens imposed on the successors varied with the corresponding strength of the successor relationship, thus providing an outline for deciding future cases. In Burns, there was a very weak relationship of succession between the corporations-- as the Court noted, "there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut [the predecessor] and Burns [the successor]," Burns, 406 U.S. at 286; the successor merely took over the security job that the predecessor had performed and hired a portion of guards who had been employed by the predecessor. In a situation with such a weak succession relationship, the Court held that the successor corporation only had the duty to bargain with the union representing the employees, and was not bound by the substantive terms of the predecessor's CBA.

35

In Wiley, there was a very strong relationship of
succession between the corporations--the predecessor
merged into the successor--so the Court held that the
successor was bound by the arbitration provision of the
predecessor's CBA, and, as the majority recognizes,
implicitly recognized that the successor corporation could
be bound by the substantive terms of the predecessor's
CBA as well (if the arbitrator were to so decide). The
relationship of succession in Howard Johnson was not as
strong as in Wiley--while there was a sale of assets by the
predecessor to the successor, there was not nearly as much
continuity of business operations as there was in Wiley (or
here)--so the Court held that the successor was not bound
to arbitrate under the predecessor's CBA.2

_____

2. This approach to interpreting the trilogy has the added benefit of
clarifying a cryptic piece of dicta on the successorship issue in Fall
River
Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27 (1987). Fall River
addressed the question whether Burns's holding that a successor
corporation has a duty to bargain with the union that represents the
predecessor's employees extended to a situation in which the union had
been certified by the employees long before the transition in ownership.
In discussing the background of the successorship doctrine, the Court
said the following about Burns:

> We observed in Burns that, although the successor has an
> obligation to bargain with the union, it "is ordinarily free to set
> initial terms on which it will hire the employees of a
predecessor,"
> and it is not bound by the substantive provisions of the
> predecessor's collective-bargaining agreement.

Id. at 40 (citations omitted).

The first thing to note about this passage is that it clearly plays no
part in Fall River's holding; it is simply a description of Burns
contained
in a general discussion of the development of successorship law, so it
must be understood in that context. Although the majority contends that
the statement it relies on from Fall River is only "arguably" dicta, Maj.
Op. at 16, n.5, the majority fails to explain how this statement from Fall
River was necessary to the decision in that case and therefore fails to
offer any argument that it is not dicta.

Some courts have interpreted this passage as standing for the
proposition that a successor may never be held bound to the substantive
terms of a predecessor's CBAs unless the successor consents or is the
alter ego of the predecessor, see, e.g., Southward v. South Cent. Ready

36

The question before us, then, is which type of successor, Wiley, Burns, or Howard Johnson , is AmeriSteel most like? As I argued in Part I, I believe that AmeriSteel is much more like a Wiley successor than a Howard Johnson successor. In other words, in my view there is sufficient "substantial continuity of identity in the business enterprise," between Brocker Rebar and AmeriSteel to justify holding that AmeriSteel is bound to the arbitration provision (and possibly to the substantive provisions) of Brocker Rebar's CBA with Local 430. Howard Johnson, 417 U.S. at 259 (quoting Wiley, 376 U.S. at 551).

Unfortunately, we derive no assistance from our own jurisprudence in resolving this dispute. The cases from within this circuit that interpret the Supreme Court case law can best be described as "dueling dicta": as I describe in the margin, no Third Circuit case has issued a square holding on this issue, although several have espoused one view or the other in passing.3

_____

Mix Supply Corp., 7 F.3d 487, 493 (6th Cir. 1993), and in fact the majority cites to this passage as support for its view. See Maj. Op. at 15–16. I think it preferable to read the passage as making an observation about Burns-type successors particularly (i.e., these types of successors are not bound to the substantive terms of their predecessors' CBAs), rather than a point about all successors generally, because such a reading more closely fits with the carefully circumscribed reasoning and overall approach of the Wiley-Burns-Howard Johnson trilogy. Given that the Court was so careful to limit the holdings of each case in the trilogy to "the precise facts involved here," Howard Johnson, 417 U.S. at 256 (quoting Burns, 406 U.S. at 274), it would seem incongruous to read Fall River as effecting, via dicta, an expansion of the holding of one of the trilogy beyond its "precise facts" into a general rule that covers all successors in the abstract--despite Howard Johnson's clear admonition that the concept of "a `successor' is simply not meaningful in the abstract." Id. at 262 n.9. Interpreting Fall River as effecting such an expansion would do violence to the principles and approach that underlie the Wiley-Burns-Howard Johnson trilogy.

3. Compare Shaffer v. Mitchell Transp., Inc. , 635 F.2d 261, 266 (3d Cir. 1980) ("The successorship doctrine simply allows the court to imply certain contractual duties from the predecessor's collective bargaining agreement and impose them on the successor."), Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956, 960 (3d Cir. 1974) ("Analysis of the

37

I thus agree with the majority's conclusion that no previous Third Circuit case controls our decision in this case, see Maj. Op. at 17, and that our decision must be based on an in-depth interpretation of the Supreme Court trilogy rather on an earlier panel's off-the-cuff musing on this issue. And because our cases are contradictory on the issue of a successor's liabilities on a predecessor's CBA, I cannot agree with the majority that its decision"flows logically from our existing Circuit precedent." Maj. Op. at 17. The case law cuts both ways, so a decision on this issue must stand solely on the substance of the analysis of the Wiley-Burns-Howard Johnson trilogy.

The case law from other courts of appeals also cuts in both directions, likewise noted in the margin.4 None of the

_____

Burns opinion convinces us, however, that its significance is largely limited to the particular facts of that case. . . . That there is no absolute
bar to the enforcement of labor agreements against`successor' employers in section 301 actions, such as this, is amply illustrated by the decision in John Wiley and Sons, Inc. v. Livingston."), and Teamsters Local Union No. 430 v. Cement Express, Inc., 841 F.2d 66, 69 (3d Cir. 1988) ("Burns did not deal with the question of when successorship doctrine may bind a transferee of assets to the procedural duty to submit to arbitration the question of whether the successor has somehow assumed any of the obligations of the old bargaining agreement."), with Stardyne, Inc. v. NLRB, 41 F.3d 141, 145 n.3 (3d Cir. 1994) (stating that a "successor [is] not bound by its predecessor's collective bargaining agreement"), NLRB v. Rockwood Energy and Mineral Corp., 942 F.2d 169, 174 (3d Cir. 1991) ("[A] successor is not bound by the substantive terms of its predecessor's labor agreement."), and United Steelworkers of Am. v. New Jersey Zinc Co., 828 F.2d 1001, 1010 (3d Cir. 1987) ("[A] successor employer is not automatically required to adopt its predecessor's collectively bargained agreements, see NLRB v. Burns.").

4. Compare Stotter Div. of Graduate Plastics Co. v. District 65, 991 F.2d 997, 1001 (2nd Cir. 1993) (holding that a successor corporation had a duty to arbitrate the extent of its obligations under its predecessor's CBA
because there was substantial continuity in the business enterprise), and Boeing Co. v. Int'l Ass'n of Machinists and Aerospace Workers, 504 F.2d 307, 314-16 (5th Cir. 1974) (stating that "[w]e are confident, however, that even at the most Burns has not overruled the principles of Wiley," which give broad protection to employees "against sudden changes in the employment relationship" by enforcing against successors

cases from other circuits that the majority cites in support
of its decision engages in the detailed, in-depth analysis of
the troubled trilogy that this case calls for. Additionally,
none of the cases from other Circuits recognizes, as the
majority does, that Wiley's holding necessarily means that,

_____

the duty to arbitrate under a predecessor's CBA), with Southward v.
South Cent. Ready Mix Supply Corp., 7 F.3d 487, 493 (6th Cir. 1993)
(stating that Burns and Fall River support the view that a successor is
not bound to the substantive terms of its predecessor's CBA).

Although the majority seeks to distinguish Stotter by the fact that the
successor employer "entered into an agreement with the Union which
adopted (with immaterial exceptions) the provisions of the [CBA]," Maj.
Op. at 19 n.8, it is the prior CBA (coupled with successorship status),
not the new CBA, that informs the ratio decidendi:

> [The successor employer] asserts that it could not be made a party
> to the arbitration because it was not a party to the contract with
the
> Union until May 29, 1990. . . . This argument essentially merges
> with the broader question whether the arbitrator correctly
> determined that GPC was a "successor" to Stotter.
>
> In Wiley, the Supreme Court held that the surviving corporation
> of a merger was obliged to arbitrate disputed issues under a
> collective bargaining agreement between the merged (and no longer
> existing) corporation and the union that represented the merged
> corporation's employees, even though the surviving corporation had
> not signed the contract and the contract did not contain an express
> provision binding successors.

Stotter, 991 F.2d at 1001. Stotter then undertook an extensive
"substantial continuity of identity in the business enterprise" analysis,
and based its decision on its finding that "such continuity clearly
exists"
between the predecessor and the successor. See id.; see also Chartier v.
3205 Grand Concourse Corp., 100 F. Supp. 2d 210, 213 (S.D.N.Y. 2000)
("[T]he Supreme Court has made it clear that one who succeeds to the
business of an employer that was a party to a CBA, in appropriate
circumstances, may be held to have succeeded also to its obligation to
arbitrate under a CBA irrespective of any intention to do so.").

The majority also argues that Boeing is "of limited utility" because it
predates Fall River. Maj. Op. at 19, n.8. As I argue supra note 2, the
language from Fall River that the majority relies on is not only dicta,
but
ambiguous dicta. Therefore, in this case I believe that it is Fall River
that
is of limited utility.

in the right circumstances, some substantive terms of a predecessor's CBA may be imposed on an unconsenting, non-alter-ego successor corporation. I add only that, whatever the viability of the preceding proposition, this case involves only arbitrating the applicability of the CBA, and in the thirty-seven years since Wiley, one area of doctrine that has grown stronger in that period is the Supreme Court's recognition of the importance of arbitration in a number of fields, including labor.

IV.

It is manifest from my dispute with the majority that, in its current state, the federal common law on this issue--in particular the Wiley-Burns-Howard Johnson trilogy--does not provide a clear answer in certain cases. If Wiley has been implicitly overturned by later Supreme Court cases, the Court should say so; but if, as I believe, it still plays a viable role in protecting the rights of "those employees who are in fact retained in `[t]he transition from one corporate organization to another' from sudden changes in the terms and conditions of their employment," Howard Johnson, 417 U.S. at 264 (quoting Wiley, 376 U.S. at 549), the Court should reaffirm that fact. I hope that the Supreme Court will clarify the law in this area. In the meantime, I believe that the better interpretation of Supreme Court precedent is that the rule of Wiley is still in force and that rule should be applied to the case at bar to enforce the arbitration provision of the CBA against AmeriSteel. Indeed, if Wiley has continuing viability, its rule would apply here if it applied anywhere. I would reverse the judgment of the District Court and remand with directions to order this matter to proceed to arbitration. For the foregoing reasons, I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit