07-0080-cv
Local 348 v. Meridian Management

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:  June 20, 2008

Docket No. 07-0080-cv

Decided:   October 2, 2009)

_____

LOCAL 348-S, UFCW, AFL-CIO,

*Plaintiff-Appellee,*

*-v.-*

MERIDIAN MANAGEMENT CORP.,

*Defendant-Appellant.*

_____

BEFORE: HALL, LIVINGSTON, *Circuit Judges*, and McMAHON, *District Judge.*[*]

_____

The district court issued an order compelling Defendant-Appellant Meridian Management

Corporation ("Meridian") to submit to arbitration the issue of whether it was bound by the terms

of a collective bargaining agreement ("CBA") between Plaintiff-Appellee Local 348-S, UFCW,

---

[*] The Honorable Colleen McMahon, of the United States District Court for the Southern District of New York, sitting by designation.

1

AFL-CIO ("Local 348") and Cristi Cleaning Services, Inc. ("Cristi"), Meridian's predecessor employer. On appeal, Meridian argues that it is not bound by the arbitration provision contained in the CBA because it was not a party to that agreement. We hold that, as the successor of Cristi, Meridian is obligated to arbitrate the question of whether and to what extent it is bound by the substantive terms of the CBA. Accordingly, the judgment of the district court is AFFIRMED.

Judge Livingston dissents in a separate decision.

_____

Robert G. Riegel, Jr., Coffman, Coleman, Andrews & Grogan, P.A., Jacksonville, Florida, *for Defendant-Appellant*.

J. Warren Mangan, O'Connor & Mangan, P.C., New Rochelle, New York, *for Plaintiff-Appellee*.

_____

HALL, *Circuit Judge*:

Plaintiff-Appellee Local 348-S, UFCW, AFL-CIO ("Local 348") brought suit against Defendant-Appellant Meridian Management Corporation ("Meridian), alleging that Meridian had failed to contribute to the union's Health and Welfare Fund as required by a collective bargaining agreement ("CBA") that was between Local 348 and Cristi Cleaning Services, Inc. ("Cristi"), Meridian's predecessor. The complaint sought an order compelling Meridian to arbitrate the fund dispute under the terms of the CBA. The district court found that because Meridian was the successor employer to Cristi, Meridian was required to arbitrate the issue of whether it was bound by any of the terms of the CBA. On appeal, Meridian urges us to adopt the holding of the Third Circuit in *AmeriSteel Corp. v. International Brotherhood of Teamsters*, 267 F.3d 264 (3d Cir. 2001), and conclude that, even if Meridian is obligated to arbitrate under the CBA, because

2

it is not bound by the specific terms of that agreement, arbitration would be futile because no arbitration award could receive judicial sanction. We disagree, and hold that, while Meridian's status as Cristi's successor does not automatically bind Meridian to the substantive terms of the pre-existing CBA, Meridian is required to arbitrate the issue of whether and to what extent it is bound by the terms of that agreement. We offer no opinion regarding the extent to which Meridian is bound by the substantive terms of the CBA between Cristi and Local 348. We leave that question to the arbitrator to decide in the first instance. Accordingly, the judgment of the district court is AFFIRMED.

## BACKGROUND

**I.      Meridian Management Corporation Contracts with Cristi Cleaning Services, Inc.**

In October 2003, Meridian successfully bid for a contract with the Port Authority of New York and New Jersey to provide engineering and janitorial services at the Jamaica Air Train Terminal (the "Terminal") for the period from October 2003 until September 2006. Meridian elected to perform the engineering services itself and to subcontract the janitorial services to Cristi under a contract that was to begin in December 2003 and continue until December 2004 and would thereafter automatically renew on a month-to-month basis until one party gave the other party 30-day notice of its intent to terminate the agreement.

At the time of the subcontract between Cristi and Meridian, Local 348 represented Cristi employees who worked at JFK International Airport. The CBA between Cristi and Local 348 required Cristi to contribute to Local 348's Health and Welfare Fund for each of its full-time employees. The CBA contained an arbitration clause which provided that all disputes between Cristi and Local 348 would be resolved through arbitration. The terms of the CBA were binding

3

upon Cristi and Local 348 as well as their "successors."  After Meridian awarded Cristi the subcontract at the Terminal, Local 348 and Cristi agreed to amend the CBA to apply to Cristi employees who worked at the Terminal.

In September 2005, Meridian gave Cristi 30-day notice of its intent to terminate the subcontract for the janitorial services at the Terminal, effective November 1, 2005.  Although Meridian initially accepted bids from other cleaning services, it eventually elected to perform the janitorial services at the Terminal rather than subcontracting the work to another company.  Prior to November 1, 2005, Meridian hired a majority of Cristi employees who had worked at the Terminal.  Eventually, Local 348 sought from Meridian recognition as the bargaining representative of the Meridian employees who performed the janitorial work at the Terminal. Meridian declined to recognize Local 348 as the employees' representative.

## II.     Local 348 Brings an Action Seeking to Arbitrate the Dispute

In January 2006, Local 348 filed a complaint against Meridian pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141, *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  Local 348 alleged that after November 1, 2005 there had "been a continuation of the Cristi cleaning services work" at the Terminal and that employees represented by Local 348 had "continuously performed that work by the same methods."  According to the complaint, after November 1, 2005, Meridian failed to make the contributions to the Health and Welfare Fund that were required by the CBA.  Local 348 asserted that "Meridian, by its continuation of the cleaning services work" at the Terminal, had "assumed Cristi's obligations under the CBA and . . . had a duty to contribute to the Fund" as

required by the terms of the CBA. The Union requested that the district court enter judgment compelling Meridian to submit the Health and Welfare Fund dispute to arbitration.

In July 2006, Local 348 filed a motion for summary judgment in which it argued that the arbitration provision of the CBA applied to Meridian because there was a "substantial continuity in the identity of the business" before and after Meridian assumed the janitorial services at the Terminal. Thereafter, Meridian also sought summary judgment, arguing that it was not bound by the terms of the CBA between Cristi and Local 348.

## III. The District Court Compels Meridian to Arbitrate with Local 348

In November 2006, the district court issued an order granting Local 348's motion for summary judgment and denying Meridian's motion for summary judgment. The court ordered Meridian to arbitrate. In doing so, the court determined that there was "obvious continuity in the workforce employed by [Meridian] and Cristi." It also concluded that there was "continuity in the work performed by the terminal employees under Cristi and [Meridian]," noting that, despite Meridian's claim that it had made "sweeping changes" to the nature of the cleaning work at the terminal, "the fact remains that Cristi and [Meridian] were required by contract to perform the exact same cleaning services at the terminal." Noting that Local 348 sought contributions to the Fund "for the period following [Meridian's] hiring only," the court rejected Meridian's claim that because Cristi remained a viable entity, Local 348 could have sought relief from that company. The court concluded that "[b]ecause of the circumstances presented . . . it [was] appropriate for the arbitrator to decide if [Meridian] is bound, as a successor, to any terms of the CBA beyond the obligation to arbitrate." In December 2006, the district court issued an order granting

5

Meridian's motion for a stay of its order compelling the company to arbitrate, pending the outcome of this appeal.

Meridian appeals.

## DISCUSSION

On appeal, Meridian raises three issues to support its argument that it is not obligated to arbitrate in this case. Meridian first argues that the continuing identity of the workforce between Cristi and Meridian is not sufficient to bind Meridian to the terms of the CBA between Local 348 and Cristi. Second, it contends that if the district court's analysis were correct, it would bind every successor employer to the terms of a pre-existing CBA. Third, according to Meridian, this Court should adopt the Third Circuit's reasoning in *AmeriSteel Corp. v. International Brotherhood of Teamsters*, 267 F.3d 264 (3d Cir. 2001), and find that arbitration is futile because Meridian is not bound by the specific terms of the CBA and, thus, no award could receive judicial sanction.

This Court reviews a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. *See Coosemans Specialities, Inc. v. Gargiulo*, 485 F.3d 701, 705 (2d Cir. 2007). In this case, the issue before this Court is <u>not</u> the fact-based question of whether Meridian is the successor employer to Cristi. In its brief and at oral argument, Meridian expressly denied that it was challenging the district court's conclusion on this point. Rather, we consider the legal issue of the extent to which a successor employer either 1) is obligated to arbitrate under or 2) is bound by the substantive terms of a CBA between a union and that successor employer's predecessor. We review *de novo* the district court's determination of this question of law. *Id.*

6

As discussed below, the development of the case law on this topic compels the conclusion that a successor employer is not automatically bound by the substantive terms of a pre-existing CBA, even if that successor employer retains a majority of its predecessor's workforce. However, on the unique facts of this case, we agree with the district court that this particular successor employer has an obligation to arbitrate the issue of whether, and to what extent, it is bound by the substantive terms of the CBA that governed the workforce it inherited.

**I.      *John Wiley & Sons, Inc.***

The Supreme Court first addressed the issue of successor employers in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964). In that case, certain employees of Interscience Publishers, Inc. ("Interscience") were represented by an AFL-CIO union with which Interscience had entered into a CBA. In 1961, Interscience merged with John Wiley & Sons, Inc. ("Wiley"), another publishing firm, and ceased to operate as a separate entity. Although Wiley retained the majority of Interscience's former employees, the company refused to recognize the union as the employees' bargaining representative. Wiley argued that the merger of the companies had terminated the CBA and that it had never been a party to the CBA. The union filed a complaint under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141, *et seq.*, seeking to compel arbitration.

The Supreme Court concluded that Wiley was required to arbitrate with the union under the pre-existing CBA. 376 U.S. at 548. The Court began by acknowledging "the central role of arbitration in [e]ffectuating national labor policy," and noting that it had previously "described arbitration as 'the substitute for industrial strife' and as 'part and parcel of the collective bargaining process itself.'" *Id*. at 549 (quoting *United Steelworkers of Am. v. Warrior & Gulf*

7

*Navigation Co.*, 363 U.S. 574, 578 (1960)). According to the Court, "[i]t would derogate from '[t]he federal policy of settling labor disputes by arbitration' . . . if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established." *Id.* (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 (1960)).

The Court then pointed to the necessity of balancing the interests of business owners with those of the employees, noting "[t]he objectives of national labor policy . . . require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." *Id.* According to the Court, in this context, continuing to resolve employees' claims through arbitration would "ease[]" the transition from one employer to another and avoid "industrial strife." *Id.* The Court acknowledged that under general principles of contract law a non-consenting successor would not normally be bound to the terms of a contract to which that party did not agree. *Id.* at 550. The Court noted, however, that "a collective bargaining agreement is not an ordinary contract," and that "the impressive policy considerations favoring arbitration [were] not wholly overborne by the fact that" the successor employer had not signed the contract being construed. *Id.*

Finally, the Court acknowledged that the duty to arbitrate does not survive in every case in which corporate ownership or structure changes. The Court recognized that "there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without . . .." *Id.* at 551. The Court noted that in the case of Wiley, "relevant similarity and continuity of operation

8

across the change in ownership [was] adequately evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty." *Id*.

## II.    *Burns International Security Services, Inc.*

The Supreme Court next addressed the issue of a successor employer's obligations under a pre-existing CBA in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). In that case, Burns International Security Services ("Burns") took over the task of providing security to a Lockheed facility in California. Security services at the facility had previously been provided by Wackenhut Corporation ("Wackenhut"). At the time of the changeover of security companies, Wackenhut had recently entered into a CBA with the United Plant Guard Workers of America ("UPG"), which had been recently certified as the bargaining representative of Wackenhut guards. Burns chose to retain 27 of the former Wackenhut guards. Thereafter, Burns declined to recognize UPG as the employees' bargaining representative and refused to honor the CBA between UPG and Wackenhut. UPG filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"). The NLRB concluded that Burns had violated the National Labor Relations Act ("NLRA") by failing to recognize and bargain with UPG and refusing to honor the CBA. On review, this Court held that the Board had exceeded its powers by ordering Burns to honor the CBA.

The Supreme Court affirmed this Court's decision, concluding that while Burns, as the successor employer to Wackenhut, had a duty to bargain, the company was not bound by the substantive terms of the CBA between UPG and Wackenhut. 406 U.S. at 281-82. The Court began by acknowledging with approval the NLRB's conclusion that Burns, as Wackenhut's successor, had an obligation to bargain with the union. *Id*. at 278-79. As the Court observed,

9

"where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's implementation of the express mandates of [the NLRA] by ordering the employer to bargain with the incumbent union." *Id*. at 281.

The Court also determined, however, that the duty to bargain with the incumbent union did not extend to bind Burns to the substantive terms of the existing CBA. *Id*. at 281-82. The Court noted that "Congress has consistently declined to interfere with free collective bargaining and has preferred that device, or voluntary arbitration, to the imposition of compulsory terms as a means of avoiding or terminating labor disputes." *Id*. at 282. The Court pointed to the NLRB's prior decisions which, to that point, had "consistently held that, although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." *Id*. at 284.

III.   *Howard Johnson*

In *Howard Johnson Co. v. Hotel and Restaurant Employees*, 417 U.S. 249 (1974),  the Court revisited its holdings in *Wiley* and *Burns*. In *Howard Johnson*, the Grissom family entered into an agreement with the Howard Johnson Company whereby the family would sell certain equipment to the company and lease the company a restaurant and motor lodge that had previously been operated by the family and its wholly-owned corporation. When the family operated the facilities, the employees of the restaurant and motor lodge had been represented by the Hotel & Restaurant Employees & Bartenders International Union ("Hotel & Restaurant Employees"). In its agreement with the Grissoms, Howard Johnson expressly declined either to

10

recognize the CBA between the Grissoms and the union or to assume any obligations or liabilities arising from the CBA. Howard Johnson retained only nine of the forty-five employees who had worked for the Grissoms. Characterizing Howard Johnson's failure to hire all of the Grissom's employees as an illegal lock out, the union filed a complaint under § 301 of the LMRA, seeking to compel Howard Johnson to arbitrate the extent of its obligations to the Grissom employees under the CBA. The district court held that Howard Johnson was required to arbitrate, and the Sixth Circuit affirmed. Both the district court and the court of appeals relied on the Court's decision in *Wiley* to determine that Howard Johnson, as the successor employer to the Grissoms, was required to arbitrate with the union.

The Supreme Court reversed the Sixth Circuit's decision and decided that Howard Johnson had no duty to arbitrate under the CBA. 417 U.S. at 256. The Supreme Court acknowledged the lower courts' suggestion that the holding in *Wiley*– that a successor employer is bound to arbitrate with an incumbent union– and the holding in *Burns*– that a successor employer is not automatically bound to the substantive terms of the CBA between the predecessor employer and the incumbent union– were "to some extent inconsistent." *Id*. at 254. The Court rejected the lower courts' reasoning that *Wiley* controlled the result in Howard Johnson's case simply because *Wiley* involved a suit brought under § 301 of the LMRA, while *Burns* on the other hand involved an NLRB order resulting from an unfair labor practice charge. *Id*. at 255. The Court pointed to its prior decisions holding that, while § 301 of the LMRA "authorized the federal courts to develop a federal common law regarding enforcement of collective-bargaining agreements," it was "clear that this federal common law must be 'fashion[ed] from the policy of our national labor laws.'" *Id*. (citing and quoting *Textile Workers*

11

*Union v. Lincoln Mills*, 353 U.S. 448, 456 (1957)).  The Court reasoned, "[i]t would be plainly inconsistent with this view to say that the basic policies found controlling in an unfair labor practice context may be disregarded by the courts in a suit under § 301, and thus to permit the rights enjoyed by the new employer in a successorship context to depend upon the forum in which the union presses its claims."  *Id*. at 256.

However, the Court also concluded that it was "unnecessary . . . to decide in the circumstances of th[e] case whether there is any irreconcilable conflict between *Wiley* and *Burns*" because "even on its own terms, *Wiley* does not support the decision of the courts below."  *Id*.  The Court went on to note several relevant distinctions between the facts presented in *Howard Johnson* and the facts of *Wiley*.  One of these distinctions was that *Wiley* involved a merger, "as a result of which the initial employing entity completely disappeared," while *Howard Johnson* "involves only a sale of some assets[ ] and the initial employers remain in existence as viable corporate entities . . . ."  *Id*. at 257.  According to the Court, this distinction was relevant because, as recognized in *Wiley*, New York State law "'embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation.'"  *Id*. (quoting *Burns*, 406 U.S. at 286).  Furthermore, unlike the former employer in *Wiley*, because the former employer in *Howard Johnson* continued to exist, the union had "a realistic remedy to enforce their contractual obligations" against that former employer.  *Id*.

According to the Court, the "more important" of the relevant distinctions between the facts of *Wiley* and the facts of *Howard Johnson* was that in *Wiley* "the surviving corporation hired all of the employees of the disappearing corporation."  *Id*. at 258.  The Court noted that, because John Wiley & Sons had hired the majority of its predecessor's employees, "[t]he claims

12

which the union sought to compel Wiley to arbitrate were thus the claims of Wiley's employees

as to the benefits they were entitled to receive in connection with their employment. It was on

this basis that the Court in *Wiley* found that there was 'substantial continuity of identity in the

business enterprise' . . . which it held necessary before the successor employer could be

compelled to arbitrate." *Id*. at 259 (quoting *Wiley*, 376 U.S. at 551). In *Howard Johnson*,

however, "the primary purpose of the Union in seeking arbitration . . . [was] not to protect the

rights of Howard Johnson's employees," but, rather, to protect the rights of "the former Grissom

employees who were not hired by Howard Johnson." *Id*. at 260.

According to the Supreme Court, because there was no "substantial continuity of identity

in the business enterprise" before and after Howard Johnson assumed the operation of the hotel

and restaurant, under *Wiley*, Howard Johnson had no duty to arbitrate under the CBA. *Id*. at 263

(quoting *Wiley*, 376 U.S. at 551). In arriving at this conclusion, the Court observed "[t]his

continuity of identity in the business enterprise necessarily includes . . . a substantial continuity in

the identity of the work force across the change in ownership. The *Wiley* Court seemingly

recognized this, as it found the requisite continuity present there in reliance on the 'wholesale

transfer' of Interscience employees to Wiley." *Id*. According to the Court, interpreting *Wiley* to

focus on the continuity of the identity of the workforce correctly balanced the interest of workers

with the interest of business owners:

> This interpretation of *Wiley* is consistent also with the Court's concern with
> affording protection to those employees who are in fact retained in "[t]he
> transition from one corporate organization to another" from sudden changes in the
> terms and conditions of their employment, and with its belief that industrial strife
> would be avoided if these employees' claims were resolved by arbitration rather
> than by "the relative strength . . . of the contending forces." At the same time, it
> recognizes that the employees of the terminating employer have no legal right to

13

> continued employment with the new employer . . .. This holding is compelled . . .
> if the protection afforded employee interests in a change of ownership by *Wiley* is
> to be reconciled with the new employer's right to operate the enterprise with his
> own independent labor force.

*Id*. at 264 (citation omitted).

## IV.   *Fall River*

The holdings of *Wiley*, *Burns* and *Howard Johnson*, taken together, reflect the Court's

identification of several principles that must influence any consideration of a successor

employer's obligations under a pre-existing CBA.  The decisions, particularly *Wiley*, emphasize

the central role of collective bargaining and arbitration in furthering the goals of national labor

policy – specifically by avoiding industrial strife and encouraging the peaceful resolution of labor

disputes.  *See, e.g., Wiley*, 376 U.S. at 549; *Burns*, 406 U.S. at 282.  They also demonstrate the

Court's concern with balancing the interests of the parties most affected by changes in ownership

or corporate restructuring: (1) the employees represented by the incumbent union and (2) the

successor employer.  In *Wiley*, the Court identified the successor employer's duty to arbitrate as a

means by which the employees represented by an incumbent union would be protected from a

sudden change in the employment relationship.  376 U.S. at 549.  In *Burns*, the Court declined to

bind a successor employer to the substantive terms of a pre-existing CBA, thus emphasizing the

successor employer's right to rearrange or restructure its business.  406 U.S. at 281-82.

However, even in declining to extend a successor employer's obligations to include the

substantive terms of the CBA, the Court emphasized the important role of collective bargaining

and arbitration, pointing to Congress's preference for the use of arbitration and collective

14

bargaining over the imposition of compulsory terms as means of avoiding labor disputes.  *Id*. at 282.

In *Howard Johnson*, the Court reiterated the importance of the continuity of the identity of the work force as a benchmark for determining whether a successor employer is obligated to arbitrate under the pre-existing CBA.  In so doing, the Court again stressed the necessity of balancing the interests of employees represented by an incumbent union with the interests of a successor employer.  417 U.S. at 264.  Although in *Howard Johnson* the Court declined to extend *Wiley* to the facts presented in that case, the Court's explanation for that refusal emphasized the importance of the workers' interest in being shielded from sudden changes in the employment relationship.  The Court's determination that Howard Johnson was not required to arbitrate under the CBA was based in large part on the fact that Howard Johnson's work force was not composed of the same people as the Grissoms' work force.  In other words, the Howard Johnson's workers on whose behalf the union was advocating had not had an employment relationship with the Grissoms and, thus, did not suffer changes in that relationship from which they needed protection.  *Howard Johnson* did not limit the holding in *Wiley*.  Rather, in declining to compel the Howard Johnson Company to arbitrate, the Court relied on the policies identified and addressed by *Wiley's* reasoning and determined that these policies would not have been furthered by an order compelling arbitration.

The Court most recently revisited the issue of successor employers in *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987).  There the Court discussed the rationale for extending the bargaining obligation – and recognizing the incumbent union's presumption of majority status –  in this context.  The Court described a union's precarious position during a change in ownership or corporate restructuring:

15

During a transition between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it. While being concerned with the future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer.

482 U.S. at 39. Further, the Court noted that employees facing such transitions "may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation. *This feeling is not conducive to industrial peace.*" *Id*. at 39-40 (emphasis added).

In *Fall River*, the Court reiterated the holding of *Burns* that successor employers are not bound by the substantive terms of their predecessors' CBAs. *Id*. at 40. It also extended the bargaining obligation to cases, unlike *Burns*, in which the union's certification was not recent:

We now hold that a successor's obligation to bargain is not limited to a situation where the union in question has been recently certified. Where, as here, the union has a rebuttable presumption of majority status, this status continues despite the change in employers. And the new employer has an obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor.

*Id*. at 41.

The Court also revisited the fact-based approach to determining whether a new employer is a successor to a previous employer. *Id*. at 43. It acknowledged, with approval, the NLRB's analysis that focused on "whether those employees who have been retained will understandably view their job situations as essentially unaltered." *Id*. (internal quotation marks omitted). According to the Court, "[t]his emphasis on the employees' perspective furthers the [NLRA's] policy of industrial peace. If the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation are thwarted,

16

their dissatisfaction may lead to labor unrest." *Id*. at 43-44. *Fall River* demonstrates the continued applicability of the Court's oft-stated interest in affording represented workers protection from changes in an employment relationship that result from a change in ownership. The decision also confirms that imposing on a successor employer a duty to bargain or arbitrate remains the most effective way to afford employees that important protection.

## V.  Synthesis of Case Law and the Present Case

In view of the foregoing, the district court properly concluded that Meridian was obligated to arbitrate the question of whether, and to what extent, it must comply with the substantive terms of the CBA between Local 348 and Cristi.  Neither party disputes that here, as was the case in *Wiley*, Meridian retained a majority of Cristi's employees after assuming the cleaning duties previously performed by Cristi; nor does anyone dispute that those employees continued to perform substantially the same duties for Meridian as they had for Cristi.  We acknowledge that in *Wiley* the identical situation came about as a result of a merger, while in this case the reason was the termination of Cristi's subcontract.  However, we do not believe that *Wiley* can or should be limited to situations in which a merger occurs.  Rather, as the Supreme Court recognized in *Howard Johnson*, the issue is whether there exists a "substantial continuity of identify of the work force." *Howard Johnson*, 417 U.S. at 263.  The merger of two companies, resulting in the hiring of one company's entire workforce by the other, undoubtedly creates the continuity of identity contemplated by the Court.  But we can imagine other ways in which the same identity could come about.  This case presents one of them.

In accordance with the Supreme Court's decision in *Fall River*, the existence or non-existence of substantial continuity in the context of assessing the duty to bargain is determined by

17

looking at: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; whether the new entity has the same production process, produces the same products, and basically has the same body of customers. We have previously used the *Fall River* factors to make a fact-specific finding that a successor corporation was bound by a predecessor's CBA, at least to the extent of its arbitration clause. *See Stotter Div. of Graduate Plastics Co. v. Dist. 65*, 991 F.2d 997, 1001 (2d Cir. 1993). Looking at those factors in this case, it is apparent that this particular employer, Meridian, should be required to arbitrate the degree to which it is otherwise bound by the CBA.

The key factor in our analysis is a particular fact that was not present in any of the prior jurisprudence on this subject: at all times from the time that the employees represented by Local 348 began to work at the Terminal (including when Cristi was the employer of record), those employees were essentially working for Meridian. Meridian had the contract to clean the terminal. Meridian elected to fulfill its contractual obligations by retaining Cristi – a shop that employed union workers pursuant to an existing CBA – to do Meridian's work. Their wages came from Cristi, of course, but Cristi was in turn paid by Meridian to perform the janitorial services required by the contract between Meridian and the Port Authority. Cristi was simply the middleman between Meridian and those workers. Put otherwise, when it entered into its agreement with the Port Authority and obligated itself to provide janitorial services at the Terminal, Meridian knowingly and voluntarily elected to carry out its obligation by hiring a subcontractor that employed workers represented by Local 348, pursuant to a collective bargaining agreement negotiated by Local 348. Eventually, Meridian decided to eliminate the

18

middleman and, in November 2005, entered into a direct employment relationship with approximately three-quarters of the janitorial workers at the Terminal. Otherwise, nothing changed. The same people went to the same locations and performed janitorial services that Meridian -- not Cristi -- had all along been contractually bound to provide for the Port Authority.

Looking at the *Fall River* factors against the backdrop of this crucial fact, it is clear that the district court reached the correct conclusion.

First, both Meridian and Cristi are in the business of providing janitorial services to commercial enterprises in the New York metropolitan area. Although Meridian provides more than just janitorial services, as a part of its more general provision of building maintenance services, Meridian undertakes to keep its buildings clean. To the extent that Meridian uses its own employees to perform that task, it is in the same business as Cristi.

Second, the employees who woke up one morning to find that they were now employed by Meridian rather than Cristi went to the same location -- the Terminal -- and performed the same job -- cleaning -- in substantially the same working conditions as they always did.

Third, Meridian continues to the use those same workers to provide the same product to the same customer. While Cristi, the predecessor employer, was technically providing janitorial services to *Meridian*, not the Port Authority, that is a distinction without a difference, because Cristi was acting as Meridian's subcontractor for the purpose of providing services to the Port Authority.

It is true that Cristi was not extinguished as a corporation when Meridian decided to supplant it as the provider of janitorial services. There has been no merger here and there was not even a sale of assets. Our dissenting colleague suggests that Local 348 could look to Cristi to

provide the benefits the union seeks to obtain through arbitration. In this case, however, the continued existence of Cristi is irrelevant. As in *Wiley*, Local 348 would likely have no way of obtaining the relief it has sought from Meridian by filing suit against Cristi. In *Wiley*, the original employer ceased to exist after the merger and, thus, the union could not obtain relief by filing suit against that original employer. Here, because Christi no longer employed the union members after its agreement with Meridian was terminated, Cristi had no legal responsibility to make further contributions to the Fund. There would thus be no basis upon which Local 348 could obtain those contributions from Cristi. It is neither legally required nor equitably appropriate to force Cristi to pay benefits that are owed to Meridian's employees for work being performed by Meridian. Given the nature of Local 348's claims, only Meridian can provide Local 348 with the relief it seeks.

The Supreme Court identified interests to be balanced in *Burns* and *Howard Johnson*. This, however, is not a case like *Burns*, where one security service outbid its competitor and so obtained the right to provide security services to Lockheed, the ultimate customer, and where the issue was which of two union contracts would protect the security guards. Neither is this a case like *Howard Johnson*, where most of the predecessor's employees were fired and the union was actually seeking to vindicate the rights of those displaced employees — not the rights of the few who actually remained on the job. In this case, the union is seeking health and welfare contributions for the employees who remained on the job, and who had a legitimate expectation that they would continue to receive the same compensation (including benefits) for doing the same work on behalf of the same ultimate contracting party.

Enforcing a duty to arbitrate the issue of Meridian's obligation to comply with the substantive terms of the agreement is the most effective way to balance those interests recognized by the Supreme Court in *Wiley*, as well as *Burns* and *Howard Johnson*. Arbitration provides a forum in which the two parties can offer evidence and arguments regarding their dispute. Although the obligation to arbitrate arises out of the agreement, and the case law clearly establishes that a successor is not automatically obligated by the substantive terms, requiring arbitration on this issue is the most efficient and fair means by which the parties can settle their dispute, particularly in cases like this one where the dispute arises out of the employer's refusal to honor a particular term of the CBA. The duty to recognize the union is separate from the duty to arbitrate grievances arising out of the existing CBA, and the two have different purposes. The former may lead to negotiation of a new agreement between the successor employer and the incumbent union. The latter protects the established right of union members to rely on the protections negotiated for them by their union, at least until that union negotiates a new agreement with their new employer. *See Howard Johnson*, 417 U.S. at 264 (noting that interpreting *Wiley* to require a successor employer to arbitrate "is consistent . . . with the Court's concern with affording protection to employees who are . . . retained in the transition from one corporate organization to another . . . .") (internal quotation marks omitted). The narrow issue before this Court arises from a dispute regarding the substantive terms of the CBA, not whether Meridian violated its duty to bargain or recognize Local 348. *See Wiley*, 376 U.S. at 551 ("This Union does not assert that it has any bargaining rights independent of the Interscience agreement; it seeks to arbitrate claims based on that agreement . . . not to negotiate a new agreement."). Accordingly, the district court's order of arbitration was appropriate in this case in that it required

21

the commencement of an arbitration that would decide two questions: first, the extent to which Meridian is bound by the particular provisions of the CBA at issue, and second, if Meridian is bound, then the nature of the relief available to Local 348.

We note Meridian's argument that under the district court's analysis all successor employers will be bound by the substantive terms of pre-existing CBAs. This overstates the relief awarded by the district court, however, as the very question to be considered by the arbitrator in the first instance is whether and to what extent Meridian is required to comply with the terms of the pre-existing CBA. We emphasize that our holding on this point is a narrow one. We do not intend a rule that binds all successor employers to the substantive terms of pre-existing agreements between their predecessors and the unions that represent the predecessors' employees. Rather, we conclude that, as in this case, where there are sufficient indicia of substantial continuity of identity of the workforce, it is possible that a successor employer will be bound at least by some of the substantive terms of a pre-existing CBA. Determining the extent to which the successor employer is bound by the preexisting agreement, however, is a question for the arbitrator. *See AmeriSteel*, 267 F.3d at 287-88 ("*Wiley*'s holding necessarily means that, in the right circumstances, some substantive terms of a predecessor's CBA may be imposed on an unconsenting non-alter-ego successor corporation. . . . [T]his case involves only *arbitrating* the applicability of the CBA . . ..") (Becker, *J.*, dissenting) (emphasis in original). We offer no opinion regarding the extent to which Meridian is bound by the substantive terms of the CBA between Cristi and Local 348. We leave that question to the arbitrator. [1]

_____

[1] Contrary to the dissent's assertion, the balancing test that we undertake is not "freewheeling." See slip dissent at 11. Rather, as we have explained it above and as we apply it here, its factors are those established by the Supreme Court. The situation before us, in which

## VI.    *AmeriSteel*

Meridian relies on the Third Circuit's decision in *AmeriSteel* to argue that the district court improperly compelled it to arbitrate with Local 348.  The facts of *AmeriSteel* are simple and, in this context, familiar.  In 1999, AmeriSteel Corporation ("AmeriSteel") purchased various assets of Brocker Rebar, including a facility in York, Pennsylvania, where certain employees were represented by the Teamsters.  Brocker Rebar had entered into a CBA with the Teamsters prior to the purchase of the facility by AmeriSteel.  That company hired all but six of the employees represented by the Teamsters.  Despite this, AmeriSteel consistently maintained that because it was not bound by the substantive terms of the CBA, it was not required to arbitrate under the agreement.  Prior to the effective date of the agreement between AmeriSteel and Brocker Rebar, the Teamsters filed a grievance challenging changes at the location that would occur after the purchase agreement was consummated.  After the parties were unable to resolve the dispute, the union requested arbitration pursuant to the terms of the CBA.  AmeriSteel filed a complaint in district court seeking an injunction prohibiting the union and the American Arbitration Association from proceeding to arbitration with AmeriSteel as a party.  The district court granted AmeriSteel the injunction, finding that because AmeriSteel was not the alter ego of Brocker Rebar and had not agreed to abide by the terms of the CBA, it had no duty to arbitrate.

On appeal, the Third Circuit agreed with the district court.  267 F.3d at 265.  The court began by examining the facts and holdings of *Wiley* and *Burns* and by asserting that the two cases

---

the employees represented by Local 348 were working indirectly and then directly for Meridian at all times that they worked at the terminal, presents a relatively unusual, if not unique, set of facts to which we have applied that test.

23

"appear to be in direct conflict." *Id*. at 270. According to the Third Circuit, "[o]n the one hand, the holding in *Wiley* necessarily implies that uncontesting successor employers may be bound by the substantive terms of pre-existing CBAs. But on the other hand, *Burns* endorses the idea that unwilling successors cannot be bound by such terms." *Id*. It went on to examine the Supreme Court's holding in *Howard Johnson*, and concluded that "*Howard Johnson* does not bridge the gap between *Wiley* and *Burns*, nor does it establish broadly applicable guiding principles that should be implemented when analyzing labor law successorship problems." *Id*. at 272. According to the Third Circuit, in *Howard Johnson*, the Supreme Court "downplay[ed] the significance of *Wiley*" and "t[ook] an expansive view of *Burns*, repeatedly extolling its reasoning." *Id*. The circuit court went on to presume that, because – in that court's opinion – *Howard Johnson* relied heavily on *Burns* and limited the holding of *Wiley*, "after *Howard Johnson*, *Burns* rests on solid ground." *Id*. at 273. Finally, the court concluded that, because "*Burns* . . . provides more persuasive guidance than the limited holding in *Wiley*," AmeriSteel "cannot be bound by the substantive terms of the CBA," and "because AmeriSteel cannot be bound by the substantive terms of the CBA, no arbitration award to the Union – which of course would be based on the substantive terms of the CBA – could receive judicial sanction, and therefore AmeriSteel cannot be compelled to submit to arbitration." *Id*. at 273-74.

With all due respect, we disagree with the Third Circuit's analysis of *Howard Johnson*. While *Howard Johnson* arguably did not announce any new principles in this context, it did reinforce the Supreme Court's emphasis on assessing the protectable interests in question and the means by which those interests are most effectively protected. In *Howard Johnson*, the Court discussed the rationale of *Wiley* at length and clearly established the contours of its holding. The

24

Court considered the reasoning and policies underlying both *Burns* and *Wiley* and rejected neither case. As discussed above, in declining to apply *Wiley* to the facts presented by *Howard Johnson*, the Court described the policies underlying the rationales of both *Wiley* and *Burns*. This is further evidenced by the Supreme Court's decision in *Fall River*, which reiterated and extended a successor employer's duty to arbitrate or bargain with an incumbent union.

The result of the holding in *AmeriSteel* is clear, as it eviscerates the protection of employees represented by incumbent unions—a protection that has been well identified in the Supreme Court's decisions to this point. *AmeriSteel*'s controlling rationale incorrectly minimizes the Supreme Court's clear reasoning in *Howard Johnson* and fails to account for the discussion in *Howard Johnson* of the importance of the policies first identified in *Wiley*. Further, *AmeriSteel* does not account for the oft-recognized importance of the role of arbitration in settling labor disputes. In sum, the majority in *AmeriSteel* misperceived the reasoning of *Howard Johnson* and minimized, if not ignored, the Supreme Court's repeated descriptions of the important interests at play in the context of successor employers and their obligations to incumbent unions. The result in *AmeriSteel* is one-sided in a way that is in clear conflict with the policies identified in *Wiley* and reinforced in *Howard Johnson*. We agree with the dissent in *AmeriSteel* and will not adopt the majority's reasoning in that case "because its logical consequence flatly contradicts the holding of *Wiley* . . .." *AmeriSteel*, 267 F.3d at 281 (Becker, *J.*, dissenting). As discussed in Section V, *supra*, imposing a duty to arbitrate the issue of the successor employer's obligations under the substantive terms of the CBA is the most efficient way of balancing the interests recognized by the Supreme Court in *Wiley*, *Burns*, and *Howard Johnson*. Accordingly, the district court did not err in concluding that Meridian had an

obligation to arbitrate under the CBA between Cristi and Local 348, and that it was appropriate for an arbitrator to determine the extent of Meridian's obligation to comply with the substantive terms of the CBA.

## CONCLUSION

For the reasons stated, we AFFIRM the judgment of the district court.

DEBRA A. LIVINGSTON, Circuit Judge, dissenting:

The majority opinion confuses the circumstances in which a "successor employer" has a duty to recognize and bargain with a labor union, with the much more limited circumstances in which that employer is bound to arbitrate with a union under a collective bargaining agreement to which it has not agreed. This confusion may be understandable, given "the difficulty of the successorship question," *see Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 256 (1974), and its history of bedeviling courts. *See Ameristeel Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 267 (3d Cir. 2001) (referencing the "treacherous waters" of the Supreme Court's labor law successorship doctrine); Edward B. Rock & Michael L. Wachter, *Labor Law Successorship: A Corporate Law Approach*, 92 Mich. L. Rev. 203, 203 (1993) ("Courts have struggled repeatedly to define the legal obligations of the buyer of a business that has unionized workers."). The fact remains, however, that the majority misinterprets what until today had become a settled, if not well-charted, area of law. This error leads the majority to an erroneous result in this case, and to an analysis that either will confound the "successor employer" labor law of this Circuit indefinitely or that must be limited to "the unique facts of this case," slip op. at 7 — in which event today's decision is little more than an aberrational and unjustified departure from precedent.

\* \* \*

It is well-settled that a "successor employer" — i.e., an employer whose business has a "substantial continuity" with that of its predecessor — has a duty to recognize and bargain with an existing union. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40, 43

27

(1987).  This duty arises as a consequence of federal labor law, not from any contract, and whether the "substantial continuity" test is met does turn on at least the main factors that the majority opinion discusses.  Meridian has conceded on appeal that the "substantial continuity" test is met in today's case and that Meridian therefore is a successor employer.  Consequently, Meridian concedes that it is obligated to recognize and bargain with the union, and I therefore do not find it necessary to discuss the application of the "substantial continuity" test to these facts.

"Successor employers," in some situations — but not all, as the majority at points admits — also are bound by the terms of a collective bargaining agreement ("CBA") entered into by the predecessor employer, and therefore might be required to arbitrate with the union (if that agreement contains an arbitration provision).  It is not necessary exhaustively to catalog the situations in which a "successor employer" might be bound by the pre-existing collective bargaining agreement, but previous cases generally have required a company to abide by a collective bargaining agreement where there has been a merger, where the company expressly or impliedly assumed the CBA, or where the "successor employer" is in fact simply an alter ego of the predecessor employer.  *See Howard Johnson Co.*, 417 U.S. at 259 n.5 (discussing alter ego); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548-49 (1964) (merger); *Southward v. South Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 493 (6th Cir. 1993) (assumption of liability).

All three theories are widely accepted outside the labor law context as grounds for imposing successor liability on an entity that has not itself entered into a contract but is closely related to another entity that has.  *See* 1 Fletcher Cyc. Corp. § 41.10 (updated 2008) ("The alter ego doctrine has been adopted by courts in cases where the corporate entity has been used as a subterfuge and to observe it would work an injustice."); 15 *id.* § 7121("[I]n all jurisdictions

28

today, the surviving corporation in a statutory merger has the statutory obligation to assume the duties and liabilities of a constituent corporation."); *id.* § 7142 ("An implied assumption of liabilities is one of the exceptions to the general rule of nonliability for a corporation that merely purchases the assets of another corporation."); *cf. Howard Johnson*, 417 U.S. 249 (declining to impose liability under a CBA on a corporation that merely purchased the assets of the predecessor employer, albeit on the theory that the "substantial continuity" requirement was not met).

The majority in today's decision, however, nowhere suggests that Meridian was an "alter ego" of its predecessor or that Meridian expressly or impliedly assumed the agreement at issue here, or that there was a merger. Nor does the majority argue that some other widely accepted grounds for imposing successor liability on a contract applies to this case. On the facts before us, such an argument is not available. Instead, the majority seems to hold simply that, whenever there is a "substantial continuity of identity of the workforce" between a predecessor and successor employer, the successor employer is bound at least by the arbitration clause of the CBA. In other words, *all* successor employers who hire the bulk of a predecessor's employees have a duty not only to bargain with and recognize a union but also to arbitrate with it the extent to which it is bound by the previous CBA. This is apparently the case even if the successor employer, as here, is simply a contractor who elects no longer to subcontract work that another has performed, and where there has been no merger, consolidation, stock acquisition, purchase of assets, or any voluntary assumption, explicit or implicit, of any terms of the CBA, including its arbitration provision.

29

This is hard to square with what has gone before. The Supreme Court has held that "although successor employers may be bound to recognize and bargain with the union, they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284 (1972). Granted, the Court has recognized that "in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase," a successor employer may properly be found as a matter of fact to have assumed the obligations of an existing CBA. *Id*. at 291. Such obligations, however, do not "ensue as a matter of law from the mere fact that an employer is doing the same work in the same place with the same employees as his predecessor. . . ." *Id*.; *see also Fall River*, 482 U.S. at 40 ("[A]lthough the successor has an obligation to bargain with the union . . . it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement." (citing *Burns*, 406 U.S. at 284)). If they did, such obligations would amount to imposing "something . . . from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved," which the Court has made clear is impermissible. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 551 (1964).

The majority might have argued that an arbitration clause is not a "substantive provision" of the collective-bargaining agreement — a position that would at least have attempted to reconcile the holding here with relevant Supreme Court authority. But even if the arbitration clause were not a "substantive provision" of the collective-bargaining agreement, ordering arbitration when the Supreme Court has clearly held that the substantive provisions are *not* binding on a successor employer would be futile and therefore unwarranted. *See Ameristeel*

30

*Corp. v. Int'l Bhd. of Teamsters*, 267 F.3d 264, 276-77 (3d Cir. 2001). To avoid the evident futility of its order of arbitration, the majority suggests that "it is possible that a successor employer will be bound at least by some of the substantive terms of a pre-existing CBA." Slip op. at 22. The majority can find no authority, however, to support this conclusion, at least insofar as it suggests that the substantive terms of a CBA might be binding on a successor in circumstances analogous to those presented here.

The majority tries to justify its result by heavy reliance on *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), but in so doing misreads *Wiley* and ignores several subsequent Supreme Court cases that have interpreted *Wiley* not to permit what the majority does today. *Cf. Howard Johnson*, 417 U.S. at 253 (reversing lower courts that "relied heavily on . . . *Wiley*"). In *Wiley*, the Supreme Court held that, following a merger, the merged company would be bound to arbitrate pursuant to a collective bargaining agreement entered into by one of the predecessor companies. 376 U.S. at 548. This result can be understood as a straightforward application of the widely accepted rule that a merged corporation is liable on all contracts of both predecessor corporations. Although the Supreme Court did not rely principally on common law successor liability rules in *Wiley*, it did refer to those principles as a partial explanation for its result. *See id*. at 550 n.3. Moreover, although the Court did not touch on the question whether terms of the CBA other than the arbitration clause might also be binding on the merged corporation, given the state law background rule, it would appear quite clear that the arbitrator could indeed find that the entire CBA was so binding. Arbitration was not futile in *Wiley* as it is here.

In every subsequent case construing *Wiley*, the Supreme Court has given a clear

indication that lower courts should not read too much into *Wiley*'s failure specifically to ground

its decision in common law successor liability rules. The Court has emphasized that the

background common law successor liability rule *was* important to the result in that case. In

*Burns*, for instance, Burns International Security Services, Inc. ("Burns") successfully competed

for a contract to provide plant protection services to Lockheed Aircraft Service Company

("Lockheed") and replaced the Wackenhut Corporation ("Wackenhut") as Lockheed's security

company. Burns thereafter hired a substantial number of former Wackenhut employees to do the

work under its new contract. The NLRB invoked precisely the policy concerns that the majority

invokes today — "the peaceful settlement of industrial conflicts" and protection of employees

against sudden changes — to argue that Burns was bound to Wackenhut's collective bargaining

agreement with the union. 406 U.S. at 285. But the Supreme Court rejected this argument in no

uncertain terms:

> [T]he claim is that Burns must be held bound by the contract
> executed by Wackenhut, whether Burns has agreed to it or not and
> even though Burns made it perfectly clear that it had no intention of
> assuming that contract. *Wiley* suggests no such open-ended
> obligation. Its narrower holding dealt with a merger occurring against
> a background of state law that embodied the general rule that in
> merger situations the surviving corporation is liable for the
> obligations of the disappearing corporation.

*Id.* at 286. Similarly, in *Howard Johnson*, the Court warned against "an unwarranted extension

of *Wiley* beyond any factual context it may have contemplated," emphasizing *again* the

importance in that case of the state law background rule about merger liability. 417 U.S. at 257.

The majority attempts to distinguish this precedent by arguing that the present case is different in that the members of Local 348 "were essentially working for Meridian" all along because Cristi was merely Meridian's subcontractor. Slip op. at 18. This argument is in serious tension with *Burns*, however, which involved a materially indistinguishable contracting arrangement. Lockheed terminated its existing contractor and selected a new one, which hired a majority of the previous contractor's employees. 406 U.S. at 275. Nevertheless, the new contractor was not bound by any provision of the previous CBA. The majority's analysis suggests that if Lockheed had simply fired its first security company and then elected to do the work itself, hiring many of that company's employees, then it would have been bound by the CBA's arbitration clause. But *Burns* holds that if it hired a new contractor to do the exact same thing, neither that contractor nor Lockheed would be bound. *Burns* nowhere suggests that its holding turns on such formalities. Its reasoning — that successor employers should not be bound by CBAs "negotiated by their predecessors but not agreed to or assumed by them," 406 U.S. at 284 — applies just as readily to the former case as it does to the latter.

In other words, in the major cases on which the majority itself focuses, the Supreme Court has given every indication that a successor employer generally will only need to arbitrate under a CBA where some common law theory would support successor liability on the contract. And until today's decision, the circuit courts appear to have been in accord in interpreting the law in this fashion. *See 3750 Orange Place Ltd. P'ship v. NLRB*, 333 F.3d 646, 654 (6th Cir. 2003) ("[A] new employer is not bound by the substantive terms of a collective bargaining agreement entered into by its predecessor absent an express or implied assumption of the agreement . . . ."); *AmeriSteel*, 267 F.3d at 277 ("AmeriSteel, which is not bound by the

33

substantive terms of the CBA, cannot be compelled to submit to arbitration . . . ."); *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler*, 10 F.3d 1563, 1567 (11th Cir. 1994) ("[A] successor is only bound to collectively bargain and is not bound to any extent by an existing contract between the union and the predecessor."); *New England Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339, 1342 (9th Cir. 1990) ("The flaw in the district court's reasoning is that it assumed that all successor employers will always be bound by the terms of a predecessor's CBA. However, the Supreme Court has continually indicated that a successor employer is only bound to *bargain* with a union which had a CBA with the predecessor."); *Hosp. & Institutional Workers Local 250 v. Pasatiempo Dev. Corp.*, 627 F.2d 1011, 1012 (9th Cir. 1980) ("[A] successor employer is not bound by the substantive terms of a collective bargaining agreement unless it expressly or impliedly assumes them. . . . Nor are we persuaded that the statutory duty to bargain in good faith obligates an employer in Pasatiempo's situation to arbitrate."); *Int'l Union of Elec., Radio and Mach. Workers v. NLRB*, 604 F.2d 689, 693 (D.C. Cir. 1979) ("[T]he successor employer is bound to recognize and bargain with the representative of his employees . . . . [but] is not bound by the predecessor's bargaining agreement . . . .").

The majority reads *Howard Johnson*'s discussion of a "substantial continuity in identity of the work force," 417 U.S. at 263, as license to depart from this consensus. Indeed, the majority leads off its synthesis of the case law by stating that "the issue is whether there exists a 'substantial continuity of identity of the work force.'" Slip op. at 17 (citing *id.*). But *Howard Johnson* could not have made this *the* issue without expressly overruling *Burns*, which made clear that substantial continuity of identity of the workforce "is a wholly insufficient basis for implying either in fact or in law that [the successor employer] had agreed or must be held to

34

have agreed to honor [the predecessor employer's] collective-bargaining contract." *Burns*, 406 U.S. at 286. And *Howard Johnson* did no such thing. *See AmeriSteel*, 267 F.3d at 272 ("It is important . . . to appreciate the limited scope of the Court's decision in *Howard Johnson*."); *Southward*, 7 F.3d at 494 ("*Howard Johnson* reaffirmed the *Burns* holding and further limited *Wiley*."). After stating that the "the reasoning of *Burns* must be taken into account," the *Howard Johnson* Court merely held that "*Wiley* [did] not" apply because, *inter alia*, there was no substantial continuity of identity of the workforce in that case. 417 U.S. at 256. *Howard Johnson* thus treats such continuity as a necessary *but not sufficient* condition for concluding that a successor employer is bound to arbitrate under a predecessor's CBA. *See AmeriSteel*, 267 F.3d at 269 ("[T]he 'substantial continuity' concept . . . should properly be viewed as a *necessary* but not a *sufficient* condition for the imposition of arbitration on an unconsenting successor."). This does not undercut the clear language of *Burns* — which the majority fails to cite, let alone account for in its analysis.

The majority purports to rely on this Court's decision in *Stotter Division of Graduate Plastics Co. v. District 65*, 991 F.2d 997 (2d Cir. 1993), to support its holding. In that case, however, the "successor employer" entered its own collective bargaining agreement with the union that "expressly adopted the provisions of the [predecessor's] Contract with only immaterial exceptions." *Id.* at 1002. Thus, this case provides no support for the notion that an agreement will become binding, *solely* based on a "substantial continuity" of business operations.

Because the successorship doctrine is a creature of federal common law, federal courts must decide exactly which theories of successor liability to recognize. *See* 1 Fletcher Cyc. Corp. § 41 (updated 2008) ("The tests and factors that the courts consider to determine whether

35

to disregard the corporate form differ from state to state."); *see also Wiley*, 376 U.S. at 548 ("State law may be utilized so far as it is of aid in the development of correct principles or their application in a particular case, but the law which ultimately results is federal." (citation omitted)). But the Supreme Court has, in every decision on point, indicated that the arbitration provision of a CBA is a creature of contract and therefore there must be some principled basis for saying that the defendant to be charged with the contract either has agreed to it or is so closely related to another entity that has that it is appropriate, essentially, to pierce the corporate veil and hold the defendant bound to the agreement. The repeated indication that a "successor employer" is not bound on the CBA makes clear that the mere "substantial continuity" test that the majority relies on — which makes an entity a "successor employer" bound to recognize and bargain with the union — is not enough to make the employer subject to the CBA.

It is true that some courts have described *Wiley* as creating a narrow "merger" exception to the general rule that a successor is not liable for the substantive terms of a pre-existing CBA — rather than reading *Wiley*, as I do, as simply an application of the general rule that the entire CBA may be binding on the successor employer when there is an accepted common law basis for imposing contractual successor liability on the successor employer. *E.g.*, *Indep. Sprinkler*, 10 F.3d at 1567 (11th Cir. 1994) ("In some narrow circumstances [, i.e., if the status of successor arises out of a merger,] . . . there may be an exception to the rule that the successor inherits only a duty to bargain and does not inherit a preexisting collective bargaining contract."); *New England Mech.*, 909 F.2d at 1342 (9th Cir. 1990) ("In only one case has the Supreme Court indicated that a successor employer may be bound to some of the terms of a predecessor's CBA." (citing *Wiley*)). But these particulars make no difference in substance: the

36

courts of appeals, at least since *Fall River*, have held that neither the arbitration provision nor any other terms of the CBA will be binding on a successor employer unless the successor has assumed the contract, is an alter ego of the predecessor, is the product of a merger with the predecessor, or another analogous basis exists for imposing contractual liability. From this widely understood set of rules the majority today departs, based on little more than a refusal to follow the relatively clear interpretation that the Supreme Court has given to *Wiley*.

*   *   *

The majority tries to justify its decision today on the theory that requiring arbitration "is the most effective way to balance those interests recognized by the Supreme Court in *Wiley*, as well as *Burns* and *Howard Johnson*." Slip op. at 21. The majority thus seems to believe that whether a duty to arbitrate will be imposed will depend on a freewheeling balancing test in which each panel of this Court is free to decide what result would most effectively "balance [the various] interests" at stake. In contrast, I read the Supreme Court's discussion of the relevant policy considerations as merely a partial explanation for the rule of law that the Supreme Court was laying down in those earlier cases — not as an invitation to the lower courts to decide whether successor employers are bound to arbitrate on an *ad hoc* basis, driven by our perceptions of what result in a given case will best balance the interests of employers and employees.

Even if it were appropriate to consider such policy factors in deciding whether to impose a duty to arbitrate in an individual case, the majority's discussion of them is unilluminating, involving little more than the invocation of generalities about the importance of "avoiding industrial strife and encouraging the peaceful resolution of labor disputes." Slip op. at

37

14. The majority gives no indication of why it believes that these policy ends support its result in this case, as opposed to in any other case in which a union might seek arbitration, and it gives no guidance to district courts in this Circuit as to how to determine when these factors will or will not require arbitration.

Indeed, a proper consideration of the very policy factors that the majority relies on would support a contrary result in this case. *Wiley* recognized that the duty to arbitrate should not be "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." 376 U.S. at 551. "Saddling [a successor] employer with the terms and conditions of employment contained in the old collective-bargaining contract may make . . . changes impossible and may discourage and inhibit the transfer of capital." *Burns*, 406 U.S. at 288. These factors strongly cut against imposing an obligation to arbitrate in the circumstances here.

The majority's principal policy factor in favor of requiring arbitration is that otherwise, "Local 348 would likely have no way of obtaining the relief it has sought . . . [because the predecessor employer has] no legal responsibility to make further contributions to the [Health and Welfare] Fund." Slip op. at 20. Although the Supreme Court did recognize such a factor as important in *Wiley*, where the predecessor employer no longer existed in any form other than the merged company, *see* 376 U.S. at 548, Cristi did not cease to exist when Meridian terminated its relationship with the company. Moreover, the collective bargaining agreement before us expressly addresses Cristi's obligations in the event of a takeover or transfer of its business operation. *See* Agreement Between Cristi Cleaning Servs. & Local 348-S UFCW AFL-CIO (effective Jan. 1, 2002) ("In the event the entire operation or any part thereof is sold, leased,

38

transferred or taken over by the sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this agreement for the life thereof. . . . Employees working under this agreement shall at all times be entitled, acting through the Union as their representative, to hold the Employer directly responsible for the full performance of all terms and conditions of this agreement."). Even if this provision is not applicable in the circumstances presented here, similar provisions appearing in other labor cases to have reached this Circuit suggest that it is not uncommon for unions to protect their interests by requiring predecessors to ensure that successors agree to the terms of existing collective bargaining agreements. *See, e.g.*, *In re Chateaugay Corp.*, 891 F.2d 1034, 1035 (2d Cir. 1989) ("[E]ach Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement." (emphasis omitted) (quoting the National Bituminous Coal Wage Agreement of 1984) (internal quotation marks omitted)). The availability of such contractual protections strongly suggests that labor unions have the ability through bargaining to protect their interests against changes in the employer. Thus, even assuming it were appropriate to rely on such a factor given the case law that binds us, there is no need to do violence to the principle that the labor laws do not impose a duty to arbitrate "from without," *Wiley*, 376 U.S. at 551, in order to protect unions.

Lastly, the majority's policy analysis focuses on what seems best *ex post* for the particular union before the court, and fails to give due consideration to the *ex ante* incentives that the majority's rule will create. Employers who take over an operation, as Meridian did here,

have no legal obligation to hire the old unionized employees or even to give them preference in hiring — even if the entity plans to continue doing the exact same work. *See Howard Johnson*, 417 U.S. at 261 ("[N]othing in the federal labor laws requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor . . . ." (internal quotation marks omitted)). If the new employer refuses to rehire most of the old unionized employees, the new employer will not be bound by the CBA, and in fact, it won't have to recognize or bargain with the union at all. *See id*. at 263 (holding that "continuity of identity in the business enterprise necessarily includes, we think, a substantial continuity in the identity of the work force across the change in ownership"). Although a new employer cannot refuse to rehire the old employees solely because they are in a union, I am not the first to note that employers will often be able to find ample business reasons to justify refusing to rehire old employees, rendering the protection afforded by the majority today more ephemeral than real. *See Saks & Co. v. NLRB*, 634 F.2d 681, 690 (2d Cir. 1980) (Meskill, J., dissenting) ("Although it can be argued that discriminatory practices are condemned by and actionable under . . . the National Labor Relations Act, it is obvious that the perspicacious, well-counselled employer will hire just few enough of the subcontractor's employees to elude the grasp of the successorship doctrine." (citation omitted)); *see also Fall River*, 482 U.S. at 40-41 ("[T]o a substantial extent the applicability of *Burns* [, i.e., the successor employer's obligation to bargain with the union,] rests in the hands of the successor."). Certainly, increasing the incentives for would-be successor employers to simply fire the unionized employees and start over is hardly a manifest victory for the cause of organized labor.

* * *

40

In my view, the majority misreads Supreme Court precedent. Therefore, I respectfully dissent.